556 F.2d 1331
 John BLAIR, for himself and for all other faculty employees
of the Robstown Independent School District,
similarly situated, Plaintiffs-Appellants,
v.
ROBSTOWN INDEPENDENT SCHOOL DISTRICT et al., Defendants-Appellees.
 No. 75-1364.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 8, 1977.
 
 Larry Watts, Houston, Tex., for plaintiffs-appellants.
 Richard A. Hall, J. W. Gary, Corpus Christi, Tex., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Texas.
 Before GODBOLD, TJOFLAT and HILL, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 In this case a schoolteacher whose employment contract was not renewed asserts that his nonrenewal was in retaliation for his exercise of First Amendment rights and that it was accomplished without due process of law. We affirm the decision of the district court which found against plaintiff on both contentions.
 
 
 2
 Plaintiff John Blair was employed as a high school teacher by the Robstown (Texas) Independent School District. At the close of the 1969-70 school year, defendant William Corder, Superintendent of the District, recommended to the District Board of Trustees that Blair's contract of employment not be renewed for the following year. The Board rejected this suggestion and Blair's contract was renewed.
 
 
 3
 In March 1972 both the principal of the high school and Superintendent Corder wrote Blair that he would not be recommended for continued employment. After Corder received the principal's recommendation, he presented all of his faculty recommendations for the upcoming school year to the Board at one time, including a recommendation that Blair's contract not be renewed. The makeup of the Board had changed since the rejection in 1970 of Corder's suggestion. Members generally sympathetic to Blair had been replaced by persons sympathetic to Corder and belonging to a local political group known as the Unity Party, with which Corder was associated. On March 20 the Board accepted Corder's recommendations with only momentary individualized consideration of Blair's case. It voted not to renew Blair's contract. Blair was advised of the decision by letter. He requested a full adversarial hearing before the Board as to his nonrenewal, and this was accorded on May 23, 1972. This hearing was taped, and the tape was later introduced in evidence in the district court. After the hearing the Trustees voted unanimously not to renew Blair's contract.
 
 
 4
 Blair's subsequent federal court suit resulted in several days of trial, at the conclusion of which the district court concluded that the Board had violated none of Blair's constitutional rights. Blair says that the ostensible reasons for his nonrenewal were mere pretext and that the real reason was his exercise of freedom of speech. He also asserts that he was not afforded due process of law in that the District rules were enforced against him selectively and without proper notice, that he did not receive a pre-termination hearing, and that the Trustees were not an impartial tribunal.
 
 I. The reasons for plaintiff's nonrenewal
 
 5
 The May 23 hearing before the Board was essentially a de novo proceeding. According to the taped record of this hearing and the trial testimony of the Board members, Blair was charged with two specific instances of insubordination. One was his refusal to attend two football games as required of male teachers. This occurred prior to the March 20 Board meeting. The other was his alleged violation of a rule prohibiting students engaged in a boycott from visiting classrooms.[1] This occurred in April, after the March 20 meeting but before the May 23 hearing.
 
 
 6
 There was evidence to support the district court's finding that male teachers were required as a condition of their employment to work as ticket-takers and, in effect, as guards or police at Robstown High School football games. Blair, along with other male teachers, was directed by the principal to attend. He announced he would not attend and did not attend the first game. The principal talked with him about the matter and directed him to attend the second game. Blair again stated he would not, and he did not. At the Board hearing Blair admitted that his refusals to attend the two games were retaliatory in nature for what he considered to be mistreatment by school officials. The district court did not err in finding that Blair had no valid excuse for his absences from football game duties.
 
 
 7
 Blair was also charged with knowingly violating a rule against allowing into classes students then engaged in a controversial and disruptive boycott of the school. Although Blair attempted to cast doubt on the existence and specifics of this rule, there was sufficient evidence to support the district court's conclusions that the rule prohibited the admission of boycotting students to any classroom without permission from the principal's office and that Blair knew of the rule and violated it by permitting boycotting students to address the students in his classroom. Blair's claim that the students discussed only "Chicano history" is not relevant, since the school policy was one of nonadmission, not one of preclusion of designated topics of discussion. Furthermore, we agree with the district court that such a discussion was related to the issues involved in the boycott.
 
 
 8
 The evidence before the district court, like the evidence before the Board, clearly was sufficient to establish that Blair willfully violated two important school board policies. It is not for this court to substitute its own judgment for that of the Board as to whether these infractions, neither of which can claim any constitutional protection, justified nonrenewal. The wisdom and prudence of the Board's actions is not a judicial matter. Bishop v. Wood, 426 U.S. 341, 349, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684, 692 (1976).
 
 
 9
 At trial Blair attempted to show that the Board acted against him not exclusively for the stated reasons but in whole or in part because of his liberal political views and his exercise of constitutionally protected speech. His evidence of such a motivation on the part of the Board members was weak. At the Board hearing there was an extensive review of Blair's past relationship with Superintendent Corder, occasioned by Blair's charge that Corder had planned for a long time to get rid of him at the first opportunity. In the course of this review a few bits and pieces of evidence surfaced, mostly in the form of Corder's private memoranda, which suggested that Blair's views were indeed controversial and considered by some to be too liberal. In addition, one of the Board members, Domingo Garza, was reported to have told a customer in his store that Blair was a troublemaker who was believed by some persons to be a Communist. At the hearing Board member Figueroa asked Blair if he were in fact a Communist. His answer was in the negative. These matters are not sufficient to require reversal of the district court's implicit conclusion that such impermissible considerations formed no part of the Board's decision, a conclusion supported by the testimony of the Board members themselves.[2]
 
 
 10
 Blair's more sustained effort was directed toward proving that Corder failed to recommend him for renewal because his classroom teaching was pro-labor in slant and because at a school board meeting in 1969 Blair had defended a fellow employee terminated by Corder (and in the process had strongly criticized Corder). This charge resulted in extensive inquiry at the Board hearing. The district court recognized that Corder disliked Blair and desired to remove him from the District teaching staff. The Board, however, was the entity which took the action denying renewal to Blair, deciding on sufficient evidence that nonrenewal was justified. The district court was not clearly in error when it found Blair had failed to connect the Board with any motivations Corder may have entertained with respect to constitutionally-protected subject matter. It was not shown that Corder's motivations, whatever they may have been, played
 
 
 11
 any part in the Board's decision. II. Procedural due
 
 
 12
 process; pre-termination hearing; bias of the Board
 
 
 13
 Defendants do not claim that Blair was not entitled to a hearing, arguing instead that the hearing of May 23 was sufficient. Assuming without deciding that a hearing was required,[3] we agree that the May 23 proceeding was sufficient. It was a full blown de novo hearing on the question whether Blair's contract should be renewed, not merely an appellate review of the Board's action of March 20. In the hearing the role of plaintiff was clearly assumed by school authorities, who presented evidence to support the claimed infractions of Blair.
 
 
 14
 We reject Blair's contention that he is entitled to reinstatement because he was deprived of a pre-termination hearing. Essentially his argument is that since the Board acted on March 20 without a hearing it could not thereafter validly decide after a hearing demanded by him that his contract should not be renewed. So long as the May 23 hearing itself was valid and not tainted by the March 20 action, it met any hearing requirement that may have existed as a matter of constitutional law.
 
 
 15
 Since the May 23 hearing was plenary and de novo, the Board was not precluded from considering the boycott incident, which occurred after the March hearing but before the May hearing. Blair claims to have been unaware that the boycott incident would form one of the charges against him, but there was evidence that he conferred in advance with his attorney as to this charge and that he came to the hearing prepared to offer a defense to it and did offer a defense, which included the testimony of witnesses among whom was one of the students involved in the incident. (This student's testimony was not relevant to any other issue.)
 
 
 16
 Blair failed in his attempt to convince the district court that the Board was not an impartial tribunal. Nor does the evidence compel us to disagree with the district judge. In March and May 1972 the Board was controlled by members of the Unity Party, of which Superintendent Corder was a member and which in general was more sympathetic to his administration than some of the former members of the Board. It was not proved, however, that the Board was a mere rubber stamp or instrument for Corder or for the Party. Referring to the crucial school board election, the district court found:
 
 
 17
 After the April, 1972, school trustee election, at least two of the anti-Corder votes on the Board had been replaced. The Trustees who were defeated had also supported Blair the first time his contract was in issue. But, this is no satisfactory showing that any of the winning candidates campaigned on some sort of get-rid-of-Blair platform, although, after this election, a majority of the Board was satisfied with Superintendent Corder's management of the school system.
 
 
 18
 Corder's conduct of the school system was a major issue in the campaign, and one of the aims of the Unity Party was to secure a Board which would work in greater harmony with Corder. This desire is not necessarily inconsistent with good faith and impartiality by Board members. Another panel of this court has said:
 
 
 19
 Wichita is a small organization and, not unlike other organizations, is subject to personality clashes, disagreements over policy, and factions among the directors and staff. Some of the people connected with Wichita were admirers of Robison, others were not. One of Wichita's directors had an extremely low opinion of Robison and his work. Corporate officials designated to serve as judges or arbitrators know the parties whose interests are at stake and are bound to form some judgment regarding their character and competence as well as the needs and policies of the organization. Just as a determination of bias does not follow from the fact that a hearing examiner or trial judge may entertain an unfavorable opinion of a party as a result of evidence received in a prior or connected hearing, a determination of bias will not follow from the mere fact that an arbitrator or deciding authority has prior and independent knowledge of the dispute. See McKay v. McAlexander, 9 Cir. 1959, 268 F.2d 35, 39. See also K. Davis, Administrative Law Treatise § 12.01 (1970 Supp.). Absent some showing of actual interest or partiality, we must find no denial of due process. If the courts were to find otherwise, no small public agency would be able to settle its own disputes.
 
 
 20
 Robison v. Wichita Falls & North Texas Com. Act. Corp., 507 F.2d 245, 253 (CA5, 1975). On the record before us we cannot say the Board was biased and prejudiced in violation of due process of law.
 
 
 21
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Board member Garza testified at trial that complaints concerning Blair's grading technique were also aired at the hearing. The hearing tape verifies Garza's recollection, but since only he of all the Board members mentioned it at trial as a factor in his decision, we disregard it in the following analysis
 
 
 [2]
 Blair showed by uncontradicted evidence that possibly as many as four other teachers violated the rule against admission of boycotters, but only Blair was called to account. Corder testified before the Board and the court that he considered the other teachers did not show the same pattern of defiance of school authorities that Blair did and he thought they would not repeat the violation. It was not shown that any other teacher was guilty of unexcused and unexplained refusal to perform football game duty. The Board and the court were entitled to accept Corder's explanation as valid
 
 
 [3]
 The extent of Blair's entitlement under state law would, of course, control the question of whether a hearing was constitutionally required. Siler v. Brady Independent School District, 553 F.2d 385 (CA5, 1977)