Chris **BARBRE**

v.

**GARLAND INDEPENDENT SCHOOL DISTRICT, the Board of Trustees of the Garland Independent School District, Doug Butler, Charles Cooper, Ronnie Rogers, R. E. Dodson, Harry Hill, Jim Kennedy and Darwin Morris, Eli Douglas, Charles Price and W. E. Peters.**

No. CA 3–77–0187–C.

United States District Court,
N. D. Texas,
Dallas Division.

July 5, 1979.

Frank W. Hill, Hill, Branham & Graham, Arlington, Tex., for plaintiff.

Earl Luna and Thomas V. Murto, III, Luna, Murto & Vorpahl, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, District Judge.

The plaintiff, Chris Barbre, a former untenured teacher's aide at the Garland Independent School District, brings her main claim under 42 U.S.C. § 1983, and under the First Amendment of the U. S. Constitution, alleging that her employment was not renewed because of her protected First Amendment speech. The plaintiff also brings procedural due process claims under the Fifth and Fourteenth Amendments of the U. S. Constitution, and under 42 U.S.C. § 1981. Jurisdiction is based on 28 U.S.C. § 1331 and § 1343(3) and (4). See *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 at 276–279, 97 S.Ct. 568, 50 L.Ed.2d 471.

The individual defendants, all of them officials of the Garland Independent School District, are sued individually and in their official capacities. The plaintiff seeks reinstatement, back wages, actual and exemplary damages and attorney's fees and costs. In addition, the plaintiff seeks to have "all references to her alleged 'disloyalty', termination and non-renewal," expunged from her employment records.

After considering all the evidence presented at trial, the pleadings, briefs and oral argument of counsel, the Court concludes that plaintiff fails to establish any violation of the U. S. Constitution or of federal statutory law by the School District or its officials. As will be discussed, the First Amendment claim, although plausible, does not succeed on the facts of this case, nor on the applicable law. Therefore, the Court must deny plaintiff all requested relief.

The first claim that will be considered will be plaintiff's First Amendment claim.[1] The plaintiff was employed by the Garland Independent School District (hereinafter, School District) as a teacher's aide for the 1974–1975 and 1975–1976 school years. Ms. Barbre (hereinafter Barbre, or plaintiff) was assigned to the "Cooperative Training Center," a subdivision of the Garland Independent School District whose student body is composed largely of "trainable," mentally retarded children. Some of the children at the Center are transferred there from other school districts and the Center operates as an agent for these other districts.

Defendant Charles Price, Barbre's immediate supervisor, was the "Center leader" of the Cooperative Training Center at the time of the events under consideration, and the scholastic year 1975–1976 was his first year as "Center" supervisor. Defendant Eli Douglas is and was the Superintendent of Schools for the School District; defendant W. E. Peters is and was the Assistant Superintendent for Special Services during the events in question. Mary Hale Nichols, although no longer a defendant, was the director of Special Education for the School District. Defendants Doug Butler, Charles Cooper, Ronnie Rogers, R. E. Dodson, Harris Hill, Jim Kennedy and Darwin Morris were members of the Board of Trustees of the School District during the time in question.

Employees such as teachers and teacher's aides are hired by the School District for a period stated in the employee's contract.

Barbre contends that she expressed her interest in determining whether the School District was properly implementing provisions of certain laws of the State of Texas, specifically, the statute known as "House Bill 1126."[2] Barbre contends that she ex-

---

1. The full text of the First Amendment of the U. S. Constitution reads as follows:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

2. Although the plaintiff referred to "House Bill 1126," effective September 1, 1975, 64th Legis-

lature, apparently the salary levels for aides that the plaintiff was concerned with were in effect since the year 1971–1972. What follows are the relevant portions of § 16.312 of the Texas Education Code.

(a) The annual salary of personnel authorized for employment under the Minimum Foundation Program for the school year 1971–1972 and for each year thereafter shall be the monthly base salary, plus increments, shown in

pressed her opinion about the manner in which certain provisions of that statute should have been implemented by the School District. Ultimately, she appeared at a public School Board Meeting to inquire of the Board about such implementation and to express her opinion about the matter. Additionally, Barbre made inquiries to members of the Texas Legislature and their staff to determine the validity of the defendant School District's procedures regarding the same statute.

Barbre contends that her inquiries and expressions of opinion about this matter were matters of public concern, and that her exercise of the right to make such expressions did not materially affect her usefulness as a Teacher's Aide. In addition, Barbre argues that her expressions consti-

tuted a motivating factor in the defendant's decision not to rehire her for the 1976–1977 school year. The plaintiff contends that the School District would not have reached the same decision to allow her contract to expire, in the absence of the plaintiff's inquiries and expressions.

Notwithstanding the plaintiff's allegations, this Court finds that there are two basic questions for the Court to decide in the plaintiff's First Amendment claim. The first question is whether the plaintiff's speech at a School Board Meeting was protected by the First Amendment where the plaintiff criticized her immediate supervisor and school administration for not paying her a higher salary for duties she allegedly had been performing, and for not including

the schedule (entitled "Texas State Public Education Compensation Plan") below, multiplied by the number of months prescribed in the position description herein for each respective position. The salaries fixed in this schedule are

minimum salaries only, and each district may supplement such salaries.

.　　.　　.　.　.

(c) The position descriptions, required preparation and education, and number of monthly payments authorized for each position under the Texas State Public Education Compensation Plan are as follows:

| Pay Grade | No. Mos. Paid | Class Title | Description of Positions Assigned to Class Title | Required Preparation and Education |
|---|---|---|---|---|
| 1 | 10 | Aide I | Assist teacher by duplicating materials; performing clerical operations; supervising students in routine drills or in P.T. drills or lunchroom supervision. | Some high school, community ties. |
| | | | Assist in office procedures at file clerk level. | High school graduate. |
| 2 | 10 | Aide II | Assist teacher in class drill exercises, in spotting student problems or problem students; perform functions of Aide I, as needed. | High school graduate. |
| | | | Perform stenographic, bookkeeping, and other clerical functions. | High school graduate and business college training. |
| 3 | 10 | Aide III | Relieve teacher of most routine drill of students; work in team teaching productively. Perform as an "Assistant Teacher" under direction of qualified teacher. | 2 years college or experience equivalent. |
| | | | Perform secretarial, high-level receptionist, junior accounting, personnel assistant, campus principal secretary, etc. | 2 years college plus business training. |

those higher level duties in her job description; and where the plaintiff referred sarcastically to her immediate superiors alleging administrative incompetence. The second question the Court must determine is whether her insubordination subsequent to the Board Meeting would have been an independent basis for the non-renewal of her employment contract in the absence of her expressions at the Board Meeting.

## I. *Factual Background*

Because First Amendment law involves a balancing test so dependent on the particular policy considerations of each factual instance, the facts of this case will be discussed in some detail.

Barbre's grievance with the School District, and clearly the main matter she was seeking throughout her relevant activities, was to be reclassified from a "level I Teacher Aide" to a higher paying "level III Teacher Aide" job category. Her contention was that she was qualified for and in fact had already been performing the duties of an "Aide III," but that she was not being paid the higher salary that corresponds to this work. At the public School Board Meeting where she aired her grievance, she stated: "My complaint is that now . . I feel I should receive that salary of Teacher Aide III." (P. 17, Plaintiff's Exhibit 35.)[3] Barbre also argued that when she asked her immediate supervisor, Mr. Charles Price (hereinafter, Price), on September 12, 1975, for a list of the duties that she had been performing, that he had not included some of the duties that she had in fact been performing. Barbre contended that she had, in effect, received a "demotion" in her duties, and she considered this action to be "in retaliation" for her "efforts in seeking what . . . (she was) entitled to under the law." She also considered this action to be "a rather obvious effort by the School District to keep from complying with the state law." Barbre argued that Price's description of her duties only included her "newly assigned job description and not the duties I was assigned to, not what he expected of me in the past and not the duties I have been performing." (Plaintiff's Exhibit 8.)

The relevant scenario in this case began on or about September first 1975. (Defendant's Exhibit 13.) Barbre contacted Mary Nichols (hereinafter, Nichols), Director of Special Education, and inquired about teacher aide levels as referred to in "House Bill 1126." Shortly thereafter, Barbre met with Mr. Peters (hereinafter, Peters), Assistant Superintendent for Special Services, and with Nichols, to discuss her complaint about teacher aide levels.

Nichols informed the plaintiff that she was a "level I aide" and "should be doing level I duties." (Defendant's Exhibit 13.) The plaintiff had been in touch with State Senator Oscar Mauzy's office and with officials of the Texas Education Agency. The plaintiff told Nichols that these people had advised her that if Garland Independent School District "moved to change her job assignment or duties, they were showing evidence of trying to get around state law." Nichols advised the plaintiff that to her knowledge the plaintiff was a level I aide, hired as such to do level I duties.

Later the plaintiff met with the Superintendent, Eli Douglas (hereinafter, the Superintendent, or Superintendent Douglas), concerning the same matter. His response was essentially the same as the response of Nichols and Peters. After that meeting, Superintendent Douglas instructed Nichols to call Price, the plaintiff's immediate supervisor, and to "make sure he understood that Chris was a level I aide as were all our aides, and insure her position and duties as such." According to defendant's Exhibit 13, Nichols followed that instruction. Nichols also reported that Price had questioned what a level I job entailed. Nichols asked Price to get a job description if he did not have one and to discuss his question with Peters, for further clarification.

---

**3.** Transcript of School Board Meeting, Board of Trustees, Garland Independent School District, on October 16, 1975. (Hereinafter, Transcript.)

Again on September 23, 1975, Nichols saw the plaintiff and reiterated to her that she was hired as a level I aide and asked if there was anything further that she could do or explain. According to Nichols, the plaintiff replied that "the matter was being taken care of." (Defendant's Exhibit 13, 11 and 12.) On September 30, 1975, the Superintendent wrote another memorandum to Nichols, writing, "As you recall, I instructed you at that time to visit with Mr. Charles Price and instruct him to make sure that Ms. Barbre understands, without question, that she is a teacher aide I and that her duties are that of a teacher aide I and she should perform those duties only, unless her job description is changed and she is so instructed at a later time."

On October 16, 1975, Barbre appeared at a public meeting before the Board of Trustees of the Garland Independent School District. The plaintiff maintained that she was paid as an Aide I and was qualified for (she had 96 hours college credit) and had been performing the duties of an Aide III. Barbre stated that she had learned of the "duties" that corresponded to her pay scale "quite by accident." In reviewing other matters, Barbre had found a Texas statute, "House Bill 1126," which defined the categories levels I, II, III for Aides. From this discovery, the plaintiff determined that she was qualified for and performing the duties of an Aide III, while being paid as an Aide I. Barbre had then consulted with Ms. Karol Phelan, a Committee Clerk for the Texas Senate Education Committee, who had encouraged her to pursue her inquiry. At the School Board Meeting, and prior to that, in her pursuit of her grievance, Barbre argued that "House Bill 1126" mandated that she should get paid an Aide III salary for the duties that she had been fulfilling, even though she had not been hired as an Aide III. Furthermore, she wanted an Aide III classification, even though she was no longer fulfilling the duties of an Aide III; allegedly, her duties had been cut down. The plaintiff wanted her duties back, but this time with the higher salary.

Barbre also stated at the Board Meeting, that she had never received a job description, nor had she had her duties defined to her. Barbre alleged that her supervisor had told her that she would be placed where she was needed, and she was placed in the "sub-contract area." Barbre also alleged that in a written description of her duties prepared by Price at her request, that Price had left out the duties she had been fulfilling. In addition Barbre stated that although she had heard talk of court proceedings, that she did not even have a lawyer, and that all she wanted was a "fair interpretation of her duties."

The policy of the School District in regard to Aides was to offer Aide II and III salary positions only to secretarial Aides, not Teacher Aides; Teacher Aides were hired only as Aide I's. At the School Board Meeting, the Board members made clear that according to a Texas Education Agency directive, "approved July 12, 1975" (defendant's Exhibit 25), entitled: "Implementation of House Bill 1126, 64th Legislature," three criteria had to be satisfied before a Teacher Aide would be classified in each pay scale provided by the statute. The Aide must have been employed in, qualified for and assigned to the duties in each pay grade. Thus in certain circumstances, an Aide may have the qualifications for a particular pay scale, but not have the other two criteria: the job may not have been the one they were hired for; and it may not be the job they were either assigned to or were performing. All three criteria were required for an Aide to be classified within any pay scale. The Board indicated that Barbre was not hired for an Aide III position because those positions were reserved for clerical workers in the administration building, not for "Teacher" Aides. Furthermore, under the Board approved budget and payroll system in effect, the School District did not have the resources to raise her pay grade, at that time.

In her letter to the Board, Barbre wrote: "I contend . . . that I am qualified for the position and I have been assigned to the tasks and have been performing the duties of a Teacher Aide III and I should be reclassified as such and paid accordingly

retroactive to September 1, 1975." (Plaintiff's Exhibit 17.) [4]

The main dispute as to Barbre's reclassification boils down to three general issues: first of all, whether the plaintiff was in fact performing the duties of an Aide III; and if she was, whether she was assigned those duties officially; secondly, whether those duties were taken away from the plaintiff, and whether they should be reassigned to her; thirdly, whether the School District was complying with House Bill 1126 by allegedly assigning her duties applicable to a higher classification to 'Teacher' Aide I's; or more particularly, whether what occurred with the plaintiff was in compliance with the state statute. The issue of whether Barbre was performing higher level duties was meaningful because "House Bill 1126," as interpreted by the Texas Education Agency, did establish guidelines for Teacher Aide duties and their corresponding pay grades. The statute provides that all school employees who perform duties described in the statute, and who meet the minimum qualifications for the position, must be paid according to the appropriate pay grade. (Plaintiff's Exhibits, 3, 4, 10.)

There is a possibility that at some point prior to the School Board Meeting, Barbre may have been performing some duties corresponding to a' higher classification of Teacher Aide position. However, there is a difference between claiming compensation for added work she may have done, and claiming an entitlement to a promotion under the state statute, simply because she had performed some added duties in the past. This in effect was part of her argument. She was pressuring the School District to allow her to keep those added, allegedly, assigned duties, throughout the rest of her contract that year.

It seems to the Court that if she did perform added duties, that it may have been attributable to the poor administration of the School District's management of such matters. However, this Court's proper role is not to second-guess the decisions of School District officials. The ultimate validity of Barbre's criticism, based on the state statute, has not been raised before this Court and is not crucial to the determination of the plaintiff's First Amendment claim. Plaintiff asserts that she had a right to be wrong. The plaintiff claims that she had a right to speak out on this issue, in the way that she did, and that the First Amendment protects her from losing her job. This Court's holding is to the contrary.

Beyond the plaintiff's substantive comments about her desire to get reclassified, there is another element in her speech at the School Board Meeting. Barbre publicly criticized her supervisor, Mr. Price, in a sarcastic tone. At times, the plaintiff came very close to publicly ridiculing not only Mr. Price, but also Mr. Peters. Barbre stated that others at the Cooperative Training Center would agree with her position if they were not afraid of retaliation by Price or the Administration. Barbre also insinuated that there may be misfeasance of funds by the School Administration, because she thought the money for higher salaries for Aides was available. Her entire speech at the Meeting reveals a generally hostile attitude towards her immediate superiors and the School Administration. [5]

The plaintiff's tone towards her superiors can be more sharply discerned when contrasted with the content and style of the other Aides that spoke at the School Board Meeting. From the transcript of the Meeting, two other Aides and one secretary spoke before the School Board concerning "House Bill 1126." All three of these personnel spoke briefly and limited their comments largely to two or three questions concerning their salary status as Aides, or to a general appeal for a better salary. [6]

---

4. The date mentioned here was in Barbre's view the effective date of the relevant provisions of "House Bill 1126."

5. See Appendix A for selected portions of Barbre's recorded speech at the School Board Meeting.

6. See Appendix B for the recorded speech of these three other School District personnel.

Toward the end of the Meeting, the Board of Trustees voted to approve the Administrations' practices and to overrule Barbre's requests. Later that fall, Barbre and six other Aides wrote to the State Commissioner of Education requesting an investigation into the School District's interpretation of House Bill 1126, regarding the classification of teacher and secretarial aides employed in the school system. On January 15, 1976, the Texas Education Agency conducted an investigation of the School District and found that Barbre was properly assigned within pay grade I. The investigators found only two Aides whose duties "could be construed as warranting a higher classification," although their job assignments were "predominantly in the area accepted for Aide I." (Plaintiff's Exhibit 17.) The investigation did not result in Barbre or other Aides being reclassified to a higher level.

## II. *Post Board Meeting Factual Background*

Some time after the School Board Meeting, the relationship between Barbre and Price became very strained. The plaintiff alleges that certain events are evidence for the proposition that she was being punished for her "protected speech" at the School Board Meeting. First of all, Barbre had been assigned to work with Teacher Laurita Lewis at the early part of the 1975–1976 school year, however, some time after the Board Meeting, Price assigned Barbre to Teacher Nancy Johnson. Apparently, Barbre had developed a friendly relationship with Teacher Lewis, and the plaintiff alleges that this reassignment was retaliatory conduct by Price for her criticism at the Board Meeting.

Secondly, Robert Wiegle, another Teacher, who had earlier supervised Barbre, testified about a conversation that he had with Price, the very next day after the Board Meeting. Wiegle stated that Price was

"upset" because "Chris had said some unkind things about the program" at the Board Meeting. Wiegle also stated that Price warned him not to get involved because involvement could jeopardize his career.

In addition, Wiegle and Lewis, both Teachers who had supervised Barbre, and who had developed a good working relationship with her, testified that they felt Price "singled out" the plaintiff from other Aides and Teachers, in his treatment following the Board Meeting. Much of this "singling out" was allegedly in the form of Price having a stricter attitude towards her, at times referring to her directly at Center Meetings. It is alleged that Price would ask her to go to the back of the room to perform some menial task, thereby "isolating her" from other Center activities.

There is testimony that in social situations Price referred to Barbre as a "big mouth." In addition, at one point, Price was reported to have stated: "if it were not for people like You (plaintiff), there would be no need for laws," apparently referring to her critical nature. Moreover, Barbre testified that on one occasion, Price had made a comment about how Barbre should try "bending down" to get some work she had been doing finished. Barbre stated that no one else was present at that time. The plaintiff apparently believed that the comment was a facetious sexual statement designed to humiliate her.

There was also mention of Price's practice of keeping regular notes on Barbre's work performance and conduct at the Center. (Plaintiff's Exhibit 25.)[7]

On one other occasion, one of the Teachers testified that Price had asked her to keep a record of how many times Barbre went to the restroom. The Teacher testified that when she asked Price if this request was only in regard to Barbre, that Price had retracted his request.

---

7. The first entry of these notes submitted into evidence (Plaintiff's Exhibit 25) was marked "October 24, 1975," which of course is soon after the School Board Meeting, and the last entry was marked, "May 20th, 1976."

On the other hand, there is also testimony that Barbre articulated her dislike of Price,[8] and that she criticized his administrative and personal attributes. One Teacher testified that although others at the Center criticized Price, that Barbre was more "outspoken" about it. Furthermore, there was mention of at least one occasion when cuss words uttered by Barbre in reference to Price, were within Price's hearing range. Apparently, other people heard these derogatory remarks about Price. In addition, an administrative secretary at the Cooperative Center, testified that Barbre had on one occasion rummaged through Price's desk, seeking Price's notes on her performance.

The evidence shows that on October 9, 1975, before the Board Meeting, that Price, in a memorandum made in response to Barbre's request for a written definition of her duties, described Barbre as having functioned in the duties assigned in a most proficient manner." (Plaintiff's Exhibit 6.)

When Price evaluated Barbre on November 14, 1975, he rated her as satisfactory or outstanding in 17 of 18 categories (Plaintiff's Exhibit 16); he rated her as satisfactory with respect to the category designated "Punctual and Regular in Attendance." However, in the category of "Exhibits Positive Reaction to Supervision," Price marked "requires improvement." Price also commented that Barbre: "Works well with students, however, at times demonstrates a less than satisfactory attitude towards supervision. Will be re-evaluated in the Spring."

In a third evaluation on February 27, 1976, Price evaluated Barbre as satisfactory in the category entitled "Response to Supervision and Suggestions for Improvement." (Plaintiff's Exhibit 18.) However, in this third evaluation, Price marked three categories as areas where Barbre needed improvement: "1) Health and Energy; 2) Contributes to pleasant working conditions; 3) Understanding of management and part she plays in the achievement of school activities."

Significantly, in this third evaluation form, Price marked only one area as unsatisfactory: "Loyalty to School and Administration." Moreover, referring to this unsatisfactory mark, in a note at the bottom of the evaluation form, Price stated: "Area in question is H.B. 1126 w/ref. level of Aides." (Plaintiff's Exhibit 18.) Price rated Barbre as above average in the category designated "Observes Prescribed Work Hours." In the overall category, Price wrote, "considering total effectiveness, I believe this employee should be rated . . . needs improvement, Level I." Price commented on the evaluation form, "not to recommend for teacher Aide I contract next year; however, to be considered for higher level of Aide if feasible."

Price did not recommend that Barbre be offered a new contract for the 1976–1977 school year. Barbre obtained a meeting with Peters, Nichols, and Price concerning the recommendation not to renew her contract. The result of the meeting was that Barbre would not be recommended for a new contract.

Barbre then contacted Superintendent Douglas, requesting an explanation for why she was not being offered a contract for the 1976–1977 school year. The Superintendent requested Price, Nichols, and Peters to inform him about the reasons for the recommendation. Nichols and Peters wrote memoranda to the Superintendent informing him that Price had reported to them his dissatisfaction with Barbre. Both recommended that Price's decision be honored. Price explained his reasons for his dissatisfaction with Barbre in an April 23, 1976, letter to the Superintendent. (Plaintiff's Exhibit 21.)

Superintendent Douglas then wrote Barbre that she was not recommended to the Board of Education for re-employment due to the recommendation of her supervisor because of the reasons stated by Price. The other employees who actively sought reclassification at the Board Meeting were all offered employment with the School District for the 1976–1977 scholastic year, and

---

8. See Appendix C for selections from Teacher Nancy Johnson's deposition testimony, p. 35.

three are still employees of the School District.

In his April 23, 1976, letter to the Superintendent (Plaintiff's Exhibit 21), Price wrote that Barbre was unwilling or unable to follow directions and supervision; demonstrated open hostility toward the authority of the teachers and supervisor; demonstrated a lack of loyalty, and was absent an excessive number of times. Price concluded that Barbre was a disruptive influence at the Center and had lost her effectiveness as a productive staff member.

In his testimony at trial, Price indicated that he felt Barbre demonstrated hostility toward him and made remarks in the presence of others that undermined his authority and ability to supervise the Center. Generally, Price thought that Barbre's conduct toward him and some other members of the staff was a disruptive influence on the operations of the Center. Price stated that he believed that Barbre was being disruptive and hostile to him due to not obtaining a higher classification than Level I. Moreover, as has been mentioned, Price thought that Barbre's absence record over the two years she worked at the Center had been excessively high.

### III. First Amendment Case Law

■ It is clear that public employment is a benefit which cannot be conditioned upon the denial of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). Plaintiff Barbre's claim under the First Amendment is not defeated by the fact that she did not have tenure. Even though she could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire her, *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, she may nonetheless establish a claim to reinstatement if the decision not to rehire her was made by reason of her exercise

of constitutionally protected First Amendment freedoms. *Perry v. Sindermann*, supra; *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 283, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

However, the Supreme Court has recognized in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Of course, regulations and restrictions on the exercise of First Amendment freedoms "should not lightly be imposed." *Hobbs v. Thompson*, 448 F.2d 456, 470 (5th Cir. 1971); *Smith v. U. S.*, 502 F.2d 512 (5th Cir. 1974).

■ The Court looks to the Supreme Court case of *Pickering v. Board of Education*, supra, and its progeny to determine whether the speech of a government employee is constitutionally protected expression. In *Pickering*, the Supreme Court said that the First Amendment requires striking "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

In applying this test, the Court articulated several of the factors which might be considered. The Court noted it is relevant whether the employee's speech raised a "question of maintaining either discipline by immediate superiors or harmony among coworkers," Id., or interfered with the regular operation of the office generally. Id. at 1737.

The Court also asked whether the employee who criticized his superior had "[T]he kind of close working relationships (with supervisors he criticized) for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." Id. at 1735.[9]

In addition, the Court asked whether the speech impeded the employee's proper per-

---

9. In a footnote, the Court elaborated by saying that "significantly different considerations

would be involved in" cases involving government jobs, "in which the need for confidentiali-

formance of his daily duties. Id. at 1737. The Fifth Circuit clarified this question in *Smith v. United States*, 502 F.2d 512, 517 (5th Cir. 1974), holding that: "In order for the government to constitutionally remove an employee from government service for exercising the right of free speech, it is incumbent upon it to clearly demonstrate that the employee's conduct substantially and materially interferes with the discharge of duties and responsibilities inherent in such employment. *Battle v. Mulholland*, 439 F.2d 321 (5th Cir. 1971).

In *Givhan v. Western Line Consolidated School District*, —— U.S. ——, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court reaffirmed the *Pickering* test in general, and expanded the factors that may be balanced against the exercise of First Amendment freedoms when a government employee is confronting an immediate superior. "When a government employee personally confronts his immediate supervisor, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message, but also by the manner, time, and place in which it is delivered." 99 S.Ct. at 696 n. 4.

On the other side of the balance a Court must consider the values of First Amendment protection. Here the Court in *Pickering* emphasized, "The public interest in having free and unhindered debate on matters of public importance." *Pickering*, supra, 88 S.Ct. at 1737. The Court added, "[T]hat statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." (Citing *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), and *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). Id.[10]

Unless this balance favors the government, the government should not be permitted to punish an employee for truthful speech, or for false speech made without malice or reckless disregard of the truth. *Pickering*, supra, 88 S.Ct. at 1738.

However, establishing that a particular expression is protected by the First Amendment is not the only element needed to obtain relief. The Supreme Court also requires a showing that the constitutionally protected conduct was a "motivating" or "substantial" factor in the School District's decision not to rehire the plaintiff. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). See *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555 at 270–271, n. 21, 50 L.Ed.2d 450 (1977).

▪ In *Mt. Healthy*, supra, the Supreme Court added still another element for the attainment of relief in a First Amendment case. The Supreme Court stated the complete test that Courts should use in cases like the one at bar: Initially, the burden is on the plaintiff to show that her conduct was constitutionally protected, and that this conduct was a motivating factor in the

---

ty is so great that even completely correct public statements might furnish a permissible ground for dismissal," or "in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." Id. at 1735, n. 3.

10. In the *Garrison* case, the New York Times test was specifically applied to a case involving a criminal defamation conviction stemming from statements made by a district attorney about the judges before whom he regularly appeared.

The Supreme Court qualifies its statement in a significant passage for purposes of the case at bar: "While criminal sanctions and damage awards have a somewhat different impact on the exercise of the right to freedom of speech from dismissal from employment, it is apparent that the threat of dismissal from public employment is nonetheless a potent means of inhibiting speech. We have already noted our disinclination to make an across-the-board equation of dismissal from public employment for remarks critical of superiors with awarding damages in a libel suit by a public official for similar criticism.

However, in a case such as the present one, in which the *fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher*, we conclude that it is necessary to regard the teacher as the member of *the general public he* seeks to be."

Board's decision not to rehire her. After the plaintiff carries that burden, however, the Court should determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to plaintiff's reemployment even in the absence of the protected conduct.

The *Mt. Healthy* case involved a teacher also without tenure, similar to plaintiff Barbre. The Court held that Doyle's communication to a radio station concerning the school's new teacher-dress code was protected conduct under the First Amendment. Nevertheless, the Court remanded so that the district court could consider whether the same decision not to rehire would have been made given the other circumstances. Apparently, Doyle had also "used obscene gestures to correct students in a situation in the cafeteria causing considerable concern among those students." [11]

**IV.** *Issue of Plaintiff's Protected Speech*

■ This Court finds that under the facts of this case the plaintiff's speech is not protected by the First Amendment. The Court holds that the School District had significant interests as an employer in dealing with the plaintiff that were not present in *Pickering v. Board of Education*, supra. First of all, unlike the *Pickering* case, in the case at bar, "the fact of employment is clearly the central focus of the plaintiff's communications. The Court in *Pickering* stated:

> "However, in a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as the member of the general public he seeks to be."

In the case at bar, it was the matter of public concern which was "tangentially and insubstantially involved in the subject matter of the public communication." The nature of the plaintiff's communications related to the immediate terms and conditions of her employment, and only tangentially to matters of public concern, like the School District's interpretation of "House Bill 1126." Her concern with the state statute was only a vehicle for the attainment of her desired pay increase or promotion.

The content of the plaintiff's expressions was significant to the School District's efficiency in promoting its services. The plaintiff was criticizing the structure of her everyday duties, salary and supervision at the School District. As has been stated, the student body of the Cooperative Training Center was composed of trainable, mentally retarded children; it appears to the Court that this work requires harmony and cooperation among the workers to deal with the sensitive matters inherent in the employment. Moreover, because Price was relatively new at his position, public criticism of the plaintiff's sort, would tend to be more disruptive than if supervision was under more experienced management. The Court cannot regard the plaintiff as exercising rights similar to those that a member of the general public could exercise.

Plaintiff Barbre's communications raised questions of "maintaining either discipline by immediate superiors or harmony among coworkers," and "interfered with the regular operation of the schools generally." *Pickering*, supra, at 1737. In the Court's opinion Barbre's relationship with Price was of such a nature that "certain forms of public criticism of the superior by the subordinate would seriously undermine the ef-

11. The Court elaborates on this element in First Amendment analysis:

"The constitutional principal at stake is sufficiently vindicated if such an employee is placed in *no worse* a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer

from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."

The Court stated "the proper test to apply in the present context is one which likewise protects against the invasion of constitutional rights without commanding undesirable consequences not necessary to the assurance of those rights."

fectiveness of the working relationship between them." *Pickering*, supra, at 1735, n. 3. In addition Barbre's speech "impeded the teacher's proper performance of [her] daily duties," and her intensity at the Board Meeting created an atmosphere which "substantially and materially interfered with the discharge of . . . responsibilities inherent in such employment." *Pickering*, supra, at 1737; *Smith v. U. S.*, supra. This interference with the proper functioning of her employment duties occurred not only because of the content of her expressions, but also because when Barbre confronted her supervisors, the School District's efficiency was threatened by the "manner, time and place" in which it was delivered. *Givhan v. Western Line Consolidated School District*, —— U.S. —— at ——, 99 S.Ct. 693 at 696, n. 4, 58 L.Ed.2d 619 (1979). *Bradford v. Tarrant County Junior College Dist.*, 492 F.2d 133 (5th Cir. 1974).

The plaintiff could have achieved her purposes in less disruptive ways. *Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979); see e. g., *Pickering*, supra, 88 S.Ct. at 1737, n. 4. When the institutional effects of the plaintiff's conduct are balanced against the insubstantial matters of "public concern," in Barbre's statements, this Court holds that the First Amendment does not protect her speech.

## V. *The Mt. Healthy "Same Decision" Test*

■ Assuming, arguendo, that plaintiff Barbre's communications were protected by the First Amendment, the Court finds that she still could not succeed on the merits under the holding of *Mt. Healthy*. Subsequent to the Board Meeting, the plaintiff was insubordinate and defensive towards Price because her grievance had been decided against her. Although the plaintiff's speech was a motivating factor in the non-renewal of her employment contract by the School District, Barbre's conduct subsequent to the Board Meeting would not be protected by the First Amendment, even though her speech were protected.

The plaintiff's attitude and conduct after the Board Meeting perpetuated a disharmonious situation at the "Center." It was originally plaintiff's speech that injured working relationships at the Center; Price also reacted defensively. Before long the working situation became strained. Although Barbre's School Board presentation and Price's reaction to it was in part a cause of the strained working relationships, this was not the complete cause. The plaintiff was also unduly aggressive towards Price after the Board Meeting.

The plaintiff alleges that Price's reasons for recommending non-renewal were a sham. The plaintiff argued that she would not have lost her job in the absence of her "constitutionally protected conduct." The Court cannot agree. Insofar as Price's absenteeism rationale for Barbre's non-renewal is concerned, it is doubtful whether this in itself would be a sufficient explanation for Barbre's non-renewal. In addition as to the rationale regarding Barbre's "lack of loyalty" towards the School Administration, this explanation seems to be attributable to the plaintiff's expressions at the School Board Meeting. However, as to the plaintiff's insubordination, subsequent to the Board Meeting, the Court finds that this was a valid and separate explanation for non-renewal. The plaintiff's post Meeting conduct was an intervening cause of her non-renewal. The Court finds that the School District showed by a preponderance of the evidence that its officials would have made the same decision to non-renew the plaintiff, given Barbre's conduct subsequent to the Board Meeting.

The case of *Bradford v. Tarrant County Junior College Dist.*, 492 F.2d 133 (5th Cir. 1974), supports this Court's conclusion. In *Bradford*, supra, Mrs. Bradford exercised her First Amendment rights in a faculty meeting. Subsequently, in a confidential evaluation conference, the dean of instruction remarked that the manner in which she had exercised her First Amendment rights was unprofessional and a repetition of such conduct might cause termination. Bradford took offense at this statement and the next day demanded a written retraction of the statement or she would proceed to law. Her evaluators then reconsidered their positions and recommended against her rehiring. Bradford was not rehired because her demand and threat of litigation posed

threats to the teacher evaluation system and the orderly administration of the school. The Fifth Circuit upheld the decision not to rehire her, although it is apparent that the conduct which resulted in her not being rehired grew out of her prior exercise of First Amendment rights.

In summary, this Court finds that Barbre's speech before and during the School Board Meeting was not protected by the First Amendment. Secondly, assuming arguendo, that her conduct were protected, this Court holds that though her speech was a motivating factor in her non-renewal, that her insubordinate behavior would have been an alternative cause for her non-renewal apart from any of her prior expressions. Unless this result would follow, the plaintiff would be placed in a better position by her allegedly First Amendment conduct than she would have been in otherwise. As the Supreme Court in *Mt. Healthy* made clear, the First Amendment does not require such undesirable consequences. 429 U.S. 274 at 287, 97 S.Ct. 568.

VI. *Plaintiff's Other Claims*

 Although plaintiff's complaint alleges a cause of action under 42 U.S.C. Sec. 1981, it is clear that under *Olivares v. Martin*, 555 F.2d 1192 (5th Cir. 1977), the plaintiff has failed to state a claim under that section. Section 1981 prohibits discriminatory treatment based upon race: it does not involve other categories. *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). Barbre is a white person and the issue of racial discrimination has never been alleged or even mentioned in this case. Therefore this claim must fail.

 The plaintiff also alleges procedural due process claims under the Fifth and Fourteenth Amendments of the U. S. Constitution. The plaintiff alleges that she was terminated without due process of law. These claims also do not have merit. A non-renewal public employee is entitled to procedural safeguards only if her termination or non-renewal is a deprivation of protected liberty or property interests. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Siler v. Brady Independent School District*, 553 F.2d 385 (5th Cir. 1977). There is no basis to hold that there is any property interest in the plaintiff's employment contract, she did not have any type of tenure, and at oral argument plaintiff's counsel admitted this. Mere non-retention will not deprive a person of a protected "liberty" interest, even though non-retention might make him less attractive to other employers. *Board of Regents v. Roth*, supra. Reasons for termination or non-renewal that are not made public cannot form the basis of a claim that a "liberty" interest has been impaired. *Bishop v. Wood*, 426 U.S. 341, 348–349, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). A person does not have a claim under the Fourteenth Amendment by denial of a hearing, when disclosure of his employment file would amount to stigmatization unless he asserts that the report in the files is substantially false. *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). Barbre has failed to prove she was entitled to a due process proceeding to protect a "liberty" interest. The wisdom or prudence of the actions of the Garland Independent School District administrators or the Board of Trustees is not a judicial matter. *Bishop v. Wood*, 426 U.S. 341, 349, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Blair v. Robstown Independent School District*, 556 F.2d 1331, 1334 (5th Cir. 1977).

Since Barbre has failed to establish a deprivation of her constitutional rights in connection with her not being reemployed by the Garland Independent School District after the 1975–1976 scholastic year, judgment is in favor of the defendants that Barbre take nothing. Defendants are requested to submit an appropriate judgment.

APPENDIX A

from

TRANSCRIPT OF SCHOOL
BOARD MEETING

BOARD OF TRUSTEES

GARLAND INDEPENDENT
SCHOOL DISTRICT ON

OCTOBER 16, 1975

After her introductory comments, Barbre stated:

MS. BARBRE: "I tried for a long time to get my duties explained to me, to get some direction as to what type of duties I was supposed to be performing. The only thing I could get out of my supervisor was, 'We're going to use you where you're most needed' . . I never did receive a job description from anyone. It was to the point that I was not aware of the fact of my hours even and when the students were gone I felt for a long time that my responsibilities were over so I could go home. There was a very unpleasant scene one day in the parking lot with Mr. Price when I was told that I couldn't go home and that was at least half way into the semester. I have been performing the duties of an Aide III since approximately after the first month of my employment at Cooperative Training Center.

. . . . .

Mr. Price wrote a letter that was co-authored, I guess, by the Administration. I asked him on September 12 for a letter and this was on the advice of Senator Oscar Mauzy's office in Austin and asked Mr. Price for a letter describing the duties, in detail that I had been performing since my employment with the Center. . . . Well, he wrote a fairly decent letter and never seemed to have time to get it typed to give to me. Then it was changed several times and it left out almost all the things that I do do at Cooperative Training Center, including teach the students and train the students in some of the sub-contract areas and phases of work. . . . I met with Mr. Peters and he informed me that if I did not like the way that he said it was that I really possibly didn't belong in the Garland School System and he kind of wanted me to get out of his office, but I wasn't through talking to him, so I stayed awhile, and then there was still no satisfaction so I went to see Mr. Douglas. Mr. Douglas was very, very nice, and a gentleman, and I appreciated it. But, still, I was classified as a Teacher Aide I. I really don't think that unless someone at the Cooperative Training Center feared any kind of retaliation or retribution for the questions being asked of them, how I had been used at the training center, I don't think that they would disagree with me unless they did it out of fear, and I know that Mr. Price is sitting in the back of the room and, could I ask why he omitted the fact that I had been assigned to train the students and to supervise the students, not under the direct scrutiny of a teacher, why these were omitted from my job descriptions."

BOARD CHAIRMAN: "Ms. Barbre, I believe that you have gone through those steps with him and with the Administration and this appeal is being made to the Board and really I think you should limit your questions and remarks to the Board."

MS. BARBRE: "Okay, then I would like to ask that it be reconsidered that those duties be added back to my job description, since I really feel that only because of my questioning this policy have any of my job descriptions or duties in the past been altered in any way.

. . . . .

I'm asking that the things that I have been doing be included in the letter that I asked, this is not the letter that I asked Mr. Price for, this is what the Administration felt I should have."

BOARD CHAIRMAN: "Of course, we have job descriptions for every classification in the School District. Do you not have a copy of that job description?"

MS. BARBRE: "Sir, I've said I've asked for a job description or some directions since the beginning of my employment and I have not gotten one at all. I just had responsibility, after responsibility placed on me."

BOARD CHAIRMAN: "Did you ask Dr. Douglas for a job description of your job."

MS. BARBRE: "Have I asked Dr. Douglas?"

BOARD CHAIRMAN: "In your meeting with him, did you ask him for a job description?"

MS. BARBRE: "I don't recall that I did. I think that he said that we would have to start limiting your duties to that of an Aide I, but this is a year and some odd months later. . . . It has been mentioned daily about court proceedings and court actions and court testimonies and what not and I have not implied nor accused, nor said that I was going to sue or file suit against anyone. I do not have an attorney, I have not hired one. The administration seems already convinced that this is what I am going to do and they've evidently made statements to that effect because that's what I have been told by my immediate supervisor, and I have not announced any intentions of this sort; all I want is a fair interpretation of my qualifications and my assignments in the job that I have. . .

No, I guess I saw it in Dr. Douglas' office if he says I did, but I have not seen one in the past; I was never given one; I was just told to do this and to do that and take charge of these students and train these students and run this contract; it went so far as to I was not sure if I was even going to return to Cooperative Training Center this year and Mr. Price was aware of this. The last day of school he wasn't there when school was dismissed and I went home and I received a phone call from him stating that he really wanted me to come back because the program depended a lot this year on my coming back.

. . . . .

The reason for my complaint is that it's one-fourth of the teacher aide's salary that's at stake. As a teacher aide III, I'd be making $6,030 a year. As Teacher Aide I, this year it's $4,450. Last year it was $3600. I had no complaint.

That was all I was eligible for and all I should receive. But my complaint is that now that I feel I should receive that salary of Teacher Aide III."

BOARD MEMBER: " . . . I've read Mr. Price's letter here and I believe that you're doing a fine job and I heard you comment awhile ago that you love the children and this is I think the primary qualification—and may I make this suggestion—I don't know what your financial status is one way or another, perhaps you might want to go back to school and finish up your certification and then draw twice that amount and—then—as a teacher, you see?"

MS. BARBRE: "Well, that would be nice, but I imagine that if I quit to go back to school, I best apply for a teaching position somewhere else."

BOARD MEMBER: "Not necessarily . . . ."

. . . . .

MS. BARBRE: "I'd like to ask one question. I've been informed by Senator Oscar Mauzy and his office that the money is available to reclassify the Aides and pay them a little bit more. And my question is, I want to know whether money is kind of being hung up in Austin or is it being hung up in the Garland System somewhere, they just don't want to turn it loose. Does anybody have an answer to that question?"

DR. DOUGLAS: "I'd be glad to answer that. You see, money is not there for Aides I, II and III, per se. Money is there for X number of what we call P. U.'s."

MS. BARBRE: "Do you feed all these into the computer and it spits them out? Right."

DR. DOUGLAS: "Yes, . . . You see what I am saying. You get only these many dollars, it doesn't expand. We can reclassify everybody in this system if we want to, we could hire no aides and hire more teachers, or we could hire fewer teachers and more aides un-

der certain guidelines, but there is still just so many dollars, they don't change."

MS. BARBRE: "Are instructional aides considered the excess personnel?"

DR. DOUGLAS: "The lowest paid people that are on the foundation program always have been excess units. It turns out that the Aides are the excess units and are paid totally by local tax money."

MS. BARBRE: "I'm certainly not against your office secretary, especially, or anyone else being denied an Aide III position, but I do not see that they are any more important than the Aides that are in charge of the children."

DR. DOUGLAS: "I can understand your point of view."

## APPENDIX B

from

## TRANSCRIPT OF SCHOOL BOARD MEETING

## BOARD OF TRUSTEES

## GARLAND INDEPENDENT SCHOOL DISTRICT ON

## OCTOBER 16, 1975

Mrs. Doris Delle, a secretary from Park Crest Elementary, stated that she was interested in "HB 1126" in regard to whether Aides got credit for years of experience as an Aide. Mrs. Francis Smith, a Teacher Aide at Central Elementary, stated, "I, too, would like to know how I am classified. I have two years of experience . . . and I would like to know, if in the reading it says that if you have two years of college education, or two years of equivalent, that you would be classified as a Teacher Aide II or III." At another point, Mrs. Smith stated: "There have been cases that I had a class by myself all day long and he (the principal) didn't bother about getting a . . . substitute teacher. That's why I'm asking . . . to clarify what I am . . . We're not griping; we just want to know how we stand." (Transcript, p. 15.) Ms. Faye Raines, a P.E. Instructor at Heather Glenn Elementary School, also spoke: "As P.E. Instructors, we're hired as Teacher Aides, but we don't really aid anyone, because we are the Teacher. And we're required to do lesson plans, to teach just like a certified teacher; and I realize that we knew this when we were hired, that we were not going to draw the pay of 'certified teachers', but I just feel like . . . if we're trusted to take care of boys and girls that we ought to be paid according to the highest scale for Teacher Aides . . . I feel like . . . we do work that should be paid more than just maybe typing or working in the office. And I wish you would consider this, as you think of your P.E. Instructors, because I feel that you'll do a better job if you're appreciated and have a little pat on the back every now and then. I think that we need to be better paid for our jobs." The Board Chairman responded, "Mr. Bryant (her supervisor) is not doing that?" To which Ms. Raines answered, "Mr. Bryant is a very wonderful person, don't blame him, I don't think it's his fault." (Transcript, p. 20.)

## APPENDIX C

from

## DEPOSITION OF TEACHER NANCY JOHNSON

## ON APRIL 6, 1979

Q. Did you ever hear Chris make any derogatory statements regarding Mr. Price?

A. Is that a matter of opinion?

Q. Well, if you answer yes we'll ask you what you mean by "derogatory statements"; to state specifically what you're referring to.

A. All right. Yes.

Q. Would you tell us specifically what you heard her say that you thought was a derogatory statement about Mr. Price?

A. I cannot quote her.

Q. Do you recall generally what she said, or the substance?

A. The substance of the remarks about Mr. Price were of a negative nature, bringing out his faults incapacities in his job and ability, mistakes, personal opinions of his social and moral life.

Q. To whom did you hear Chris make these statements?

A. Some were made to me, many were made to other staff members.

Q. On what occasions would these statements be made?

A. Almost always during our social times before school, lunchtime and after school.

Q. How frequently or infrequently did Chris make such remarks about Mr. Price?

A. It's difficult to pin it down exactly. But, I think I'm being truthful in saying daily.

Q. Did you ever hear Miss Barbre say anything about getting Mr. Price fired?

A. Yes, sir.

Q. What did you hear her say?

A. She said—and I'm sorry, I cannot quote specifically, because I cannot recollect specifically. But, she said that if she lost her job, she would see to it that he lost his.

Q. Do you recall to whom Chris said this?

A. She said it to me.

Q. Were you alone at the time—you and Chris?

A. I heard this several times. Several times to myself, and other times I overheard it to other staff members.

Q. Did you have any specific work assignments that you wanted Chris to perform, that she did not perform for you?

A. Yes.

Q. Would you tell us what those were?

A. Specifically, using the ditto machine to prepare instructional materials for the students.

Q. Was it very frequent that you had to prepare materials for the students?

A. As compared to what, when you say "frequent"?

Q. Was this something that you had to do daily, once a week, several times a week, once a month, once a quarter?

A. I would prefer to describe it as regularly, but not necessarily every week, if you did your work ahead of time.

Q. If Chris did not prepare these materials on the ditto machine, who did?

A. I did them.

Q. Did you ever ask Chris to run materials for you on the ditto machine?

A. Yes, sir.

Q. And did she ever run materials for you on the ditto machine?

A. Not to my recollection.

Q. Was Chris' demeanor around the Cooperative Training Center ladylike?

A. I'm sorry, Tom, would you define "demeanor" for me?

Q. When Chris was at the Training Center during working hours what was she like? Was she quiet, reserved, talkative?

A. As a reflection of my own upbringing and experience in life, responses to life, I would say that Chris was always extremely well-groomed, sociable, aggressive in some verbal ways, in that she had a tendency to want to lead or direct social interaction—interpersonal interactions.