**Franklin R. BAZ, Plaintiff,**

**v.**

**Harry N. WALTERS, Administrator of Veteran Affairs, S.H. Birdzell, and Taylor D. Neely, Defendants.**

No. 80–2189.

United States District Court, C.D. Illinois, Danville Division.

Nov. 19, 1984.

Michael Clary, Richard J. Doyle, Danville, Ill., for plaintiff.

* This is an edited transcript of the court's findings and orders given extemporaneously at the conclusion of the case.

Charlene Quigley, Asst. U.S. Atty., Danville, Ill., Charles DeLobe, Veteran's Admin., Washington, D.C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM OPINION, AND FINAL ORDER *

### I.

BAKER, District Judge.

This case involves a claim of disparate treatment in employment based on religion. The plaintiff, Franklin R. Baz, a former chaplain of the United States Veterans Administration, who was discharged on September 6, 1978, seeks reinstatement and back pay under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, damages under both 42 U.S.C. § 1981, and the First Amendment to the United States Constitution in a *Bivens*-type claim.[1] The jurisdiction of the court on the federal questions is contained in 28 U.S.C. § 1331 and under the civil rights questions raised in 28 U.S.C. § 1343(4).

### II.

The First Amendment of the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

There are also three applicable statutory provisions:

Section 703(a)(1) of the Civil Rights Act, 42 U.S.C. § 2000e–2(a)(1), provides in part:

(a) It shall be an unlawful employment practice for an employer—(1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... religion
. . . .

Section 701(j) of the same statute, 42 U.S.C. § 2000e(j), provides:

---

1. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d (1971).

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business.

The Code of Federal Regulations, 29 C.F.R. § 1605.2(b)(1) (1984), which is promulgated in furtherance of the statutory provisions, provides that it is unlawful employment practice

... for an employer to fail to reasonably accommodate the religious practices of an employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business.

### III.

A. The plaintiff is a fifty-year-old white male. He is an ordained minister of the Assembly of God and at this time resides in Ridge Farm, Illinois, which is a small rural agricultural community. He is currently engaged as the leader of a Meeting of the Society of Friends, the Quakers.

After graduation from high school the plaintiff attended The Citadel for one year but left for economic reasons and found employment. Later on he entered military service where he was a missile technician and completed his military experience as a chaplain's assistant. He was separated in 1961 and entered Southeastern Bible College in Lakeland, Florida. He worked part time and attended school and received an A.B. degree in 1967 in English Bible and Theology. He became a licensed minister and was ordained in the Assembly of God at Englehard, North Carolina, in 1970.

In August 1972, he entered Erskine Theology Seminary at Erskine, South Carolina, and attended that institution until June of 1974. He held positions as Associate Pastor and Hospital Chaplain in the next two years and during the same period attended the Lutheran Theological Seminary in Co-

lumbia, South Carolina, from which he received a Master of Divinity Degree in 1976. During the time in Columbia, South Carolina, the plaintiff also worked in the Richland Memorial Hospital and received training as an emergency medical technician and obtained one unit of clinical pastoral education.

In 1977 he applied to become a full-time Veterans Administration chaplain, although as he himself recognized he lacked the "three-year post-graduate parish ministry experience." He asked to be appointed on the basis of his work history in hospitals and in parishes.

B. The plaintiff was appointed a chaplain in the Veterans Administration on September 6, 1977, and was assigned to the Veterans Administration Medical Center in Danville, Illinois, on a probationary basis. The Danville Medical Center is a large facility which specializes in the treatment of the emotionally ill and disturbed, although it provides some general surgical and medical services. There are somewhere between 1,000 and 1,200 patients in the facility.

The plaintiff arrived in Danville in the fall of 1977 and was provided with an apartment on the federal reservation until he could draw his first pay and find a place in the community to live.[2] There were four other chaplains at Danville during the plaintiff's tenure who provided the bulk of the pastoral services to the patients. Reverend John W. Devine, a Protestant, Reverend John H. Paninski, a Roman Catholic Priest, Reverend Taylor D. Neely, a Protestant, and the Reverend Gary H. Johnson, a Protestant. Neely arrived about February, 1978, at the medical facility and assumed the position of Chief of Chaplains. He replaced Devine who was assigned elsewhere in the service.

From the beginning the plaintiff had difficulty in the discharge of his duties. Notwithstanding the plaintiff's perceptions of himself as working well with patients and

---

**2.** He stayed on in that government apartment paying rent until the end of 1977 and had to be asked to vacate the premises by the hospital administration.

with others, Reverend Devine, his superior, reported to S.H. Birdzell, the hospital administrator, that the plaintiff failed to follow regulations and received gifts and money from patients and was having trouble relating to psychiatric patients.

Birdzell personally observed the plaintiff talking with a patient and the patient appeared to experience stress from the exchange. Birdzell had also received complaints from the medical chief of staff that the plaintiff was conducting "prayer meetings" in locked wards. The plaintiff did accept honoraria for conducting two funerals and on one occasion borrowed five dollars from a patient to purchase gasoline, although the plaintiff puts a different characterization on that transaction. The plaintiff also failed to follow Veterans Administration regulations in requisitioning a movie, "The Cross and the Switchblade," for use at the hospital. In addition, he apparently was not punctual in attending to his assignments. There was also testimony that he failed to maintain records of contacts with significantly ill patients.

Those matters, however, while they appear to have entered into the plaintiff's termination, are not the primary or even the significant reason he was discharged. The crux of the plaintiff's problems lay in his relationship with the patients and with the medical staff and in the plaintiff's view of his ministry and his calling to preach the Gospel. Most of these problems came to a head after Reverend Neely arrived on station as Chief of Chaplains.

The plaintiff had been placed in charge of the Sunday evening "sung service." It was intended, Reverend Neely says, as a recreational period for the patients with music as a main attraction. The plaintiff had changed the format of the event to a Christian evangelical service. He preached and encouraged musical participation in a manner that Reverend Neely interpreted as proselytizing. On one occasion, Reverend Neely recalled, a sermon the plaintiff gave containing an illustration of threatening harm to a child's eye with a pair of scissors. The Reverend Neely found this total-ly inappropriate for a patient group which was largely psychiatric in nature and tended to concretize illustrations. Reverend Neely also found the methods employed by the plaintiff to be contrary to Veterans Administration regulations against proselytizing. Consequently, the Sunday evening services were transferred to the recreational department and the plaintiff was excluded from them.

Reverend Neely recounted other problems the plaintiff had in dealing with patients at the Medical Center. There were incidents in which the plaintiff interfered with the decisions of the medical staff. An example was given of a patient of advanced age who was dying and the plaintiff decided that the physicians were not caring properly for the patient. So the plaintiff telephoned the patient's daughter and asked her to intervene and have her father's course of treatment changed. On other occasions the plaintiff entered the operating amphitheater to pray while the physicians were engaged in surgical procedures. That occurred on four occasions, according to the plaintiff's statement, and as near as I am able to tell from the testimony, he did not have the approval of the physicians to enter the operating room on three of those occasions. Another incident was recounted by Reverend Neely involving a patient who had received the sacrament of communion and was experiencing feelings of guilt because he had done so. The plaintiff, Reverend Neely says, contradicted the assurances of forgiveness and comfort which Neely was emphasizing to the patient and instead reinforced the plaintiff's feelings of guilt and dependency.

In short, the plaintiff's view of his function as a Veterans Administration chaplain in a Veterans Administration hospital with psychiatric patients was decidedly different from the demands of his superiors. The plaintiff saw himself as an active, evangelistic, charismatic preacher while the chaplain service and the medical staff saw his purpose as a quiescent, passive listener and cautious counselor. This divergence in approach is illustrated by the plaintiff's list-

ing "twenty-nine decisions for Christ" in his quarterly report of activities to the Veterans Administration. It was one of the matters pointed out to the plaintiff by Reverend Neely as unacceptable conduct on the part of a Veterans Administration chaplain.

The plaintiff resisted Reverend Neely's attempts to counsel him and went directly to the National Director of Chaplains, Reverend Rogers, and to the leader of his denomination, Reverend Gannon. There were also times at which the plaintiff appealed directly to members of the Danville community and to the leaders of various denominational churches in the Danville community. Both the Reverend Rogers and the Reverend Gannon visited Danville in an attempt to assist the plaintiff in adjusting to his position as chaplain. It is evident from the testimony of Reverend Rogers that he viewed the placement of the plaintiff at a hospital with a heavy psychiatric caseload as a mistake. It is also obvious from the testimony that Reverend Rogers wanted to salvage the plaintiff's career and thought that transfer to a general medical and surgical facility might accomplish that. I find from the evidence that the Reverend Neely, in his initial evaluation, tried to accommodate that wish by Reverend Rogers. But with the advent of Reverend Cherry as new National Director the decision was made to terminate the plaintiff. As Reverend Cherry testified, the plaintiff should not have been appointed initially because he lacked the requisite pastoral experience following receipt of his master's degree in 1976.

C. On September 1, 1978, the plaintiff was terminated as a Veterans Administration chaplain and five reasons were advanced for the termination: (1) he failed to demonstrate appropriate professional skills for a psychiatric facility; (2) he had difficulties in assuming responsibilities for punctuality in meeting appointments and completing assignments; (3) he failed to demonstrate ability to understand a multi-disciplinary approach to patient health care; (4) he failed to understand the need to work within established procedures to accomplish objectives; and (5) he had difficulty in relating to other chaplains which complicated the effective coordination of their spiritual ministry. The EEOC adopted those reasons in its findings following its investigation of the plaintiff's discharge. The findings of the EEOC are admissible in evidence under Federal Rule of Evidence 803(8)(C) and the court concludes that those findings merit deference and are persuasive.

IV.

A. Turning to what are conclusions in the case and addressing first the claim under Title VII, to establish a case of religious discrimination under Title VII, 42 U.S.C. § 2000e–2(a)(1), the plaintiff must prove first, that he was a *bona fide* member of a particular religious community; and second, that a particular tenet of that religious community required the plaintiff to act, or to refrain from acting, in a manner which conflicted with the particular requirements of the plaintiff's employment; and, third, that the plaintiff suffered an employment-related loss because of his adherence to his religious conviction in contravention of the employer's rules.

The burden of establishing a *prima facie* case of religious discrimination is not an onerous one. The plaintiff need only show that he was discharged under circumstances which give rise to an inference of unlawful discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–254, 101 S.Ct. 1089, 1093–1094, 67 L.Ed.2d 207 (1980). The plaintiff has carried that burden by showing that he is an ordained member of the Assembly of God; that the tenets of that calling required him in his work as a Veterans Administration chaplain to conduct a ministry of active evangelism; and that as a result of the plaintiff's adherence to the precepts of his religious calling, he experienced an employment-related loss by being discharged. Those circumstances, which I have outlined, standing alone might give rise to an inference that the plaintiff was

discharged as a result of unlawful discrimination based on religion. The inference of unlawful discrimination places upon the defendants the burden of articulating some legitimate, non-discriminatory reason for the employee's discharge. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The reasons for the plaintiff's discharge advanced by the defendants are those that are set forth in the preceding section of this final order.

■ The defendants, having satisfied their burden of producing evidence tending to rebut the inference of discrimination, the burden of production shifts back to the plaintiff. That burden requires him to show that the reasons articulated by the defendants were pretext and that the true motivation of the defendants in discharging him was an intention to discriminate against him on the basis of his religion. The plaintiff also bears the ultimate burden of persuading the court that the defendants intentionally discriminated against the plaintiff as he claims. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

The requirements of proving a case under 42 U.S.C. § 1981 are the same as in a disparate treatment case under Title VII:[3]

each requires proof of intentional discrimination.[4]

■ The court concludes that the plaintiff has failed to carry the burden of persuasion, and that the reasons for the plaintiff's discharge announced are not a pretext but rather reflect the legitimate aims and needs of the defendants in conducting the affairs of the Veterans Administration. There is nothing to indicate intentional discrimination by the defendants Neely or Birdzell against the plaintiff. Neely was not antipathetic to Baz's evangelical calling. Earlier in his career Neely had been an active evangelist himself. The root of the difficulty lay in the plaintiff pursuing a course of proselytizing in a government-operated medical facility specializing in psychiatric patients. Birdzell's motivation in his dealings with the plaintiff was the furtherance of the primary aim of the hospital, specifically, the care and treatment of the patients. It was only when the plaintiff's work as a chaplain collided with the work of the medical staff that Birdzell took a position on the plaintiff's tenure. Both men, Neely and Birdzell, made an effort to salvage the plaintiff and opted for termination only when they concluded that the plaintiff was unable to conform to the de-

---

3. *See T & S Service Associates v. Crenson*, 666 F.2d 722, 724 (1st Cir.1981) ("[w]e therefore agree with the district court that the *McDonnell Douglas* principles are applicable to a claim of intentional discrimination under 42 U.S.C. § 1981"); *Cannon v. Teamster & Chauffeurs Union*, 657 F.2d 173, 177 (7th Cir.1981) (proof of discrimination required in an action under § 1981.)

A § 1981 action may not lie here because race is not an issue. Several circuits have restricted § 1981 to cases of racial discrimination. *See e.g., Patterson v. American Tobacco Company*, 535 F.2d 257 (4th Cir.1976), *cert. denied* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1978); *Windsor v. Bethesda General Hospital*, 523 F.2d 891 (8th Cir.1975). *See also Vuksta v. Bethlehem Steel Corp.*, 540 F.Supp. 1276 (E.D.Pa.1982), *aff'd* 707 F.2d 1405 (3rd Cir.1983); *Boddorff v. Publicker Industries, Inc.*, 488 F.Supp. 1107 (E.D.Pa.1980); *Barbre v. Garland Independent School District*, 474 F.Supp. 687 (N.D.Tx.1979); *Mouriz v. Avondale Shipyards, Inc.*, 428 F.Supp. 1025 (E.D.La.1977). The Seventh Circuit has ap-

plied 42 U.S.C. § 1981 in a denial of equal protection case involving race where federal employees were the plaintiff, *City of Milwaukee v. Saxbe*, 546 F.2d 693, 703 (7th Cir.1976); recently, the Seventh Circuit has stated that § 1981 applies only to alleged discrimination on the basis of race or alienage. *Alfred St. Louis v. Alverno College*, 744 F.2d 1314, 1317 (7th Cir.1984); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1259 (7th Cir.1984). *Cf. Reese v. Abbott Laboratories*, 493 F.Supp. 185 (N.D.Ill.1978) (holding that 42 U.S.C. § 1981 does not create a cause of action for religious discrimination and that the weight of authority limits the application of § 1981 to racial discrimination cases only). But, be that as it may, no problem is raised in this case because the elements of the cause of action, irrespective of the basis of the claim, are the same.

4. For the meaning of intentional discrimination, *see U.S. Postal Service Board v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

mands of a multi-disciplinary approach to patient health care.

The requirements of the statute and of the Code of Federal Regulations that the employer attempt to accommodate the religious precepts and demands of an employee unless undue hardship would be incurred by the employer are also satisfied in this case. The choice of transfer was not a realistic one. As Reverend Cherry testified at Page 24 of his deposition:

> That the transfer of Chaplain Baz from Danville to Beckley, West Virginia, was an unwise decision. First of all, the man was in his probationary term. Also he had been having difficulties on his station. And we had a couple of policies in central office which we followed. One was not to transfer a man while he was in his probationary time and not to transfer a man if he had difficulties because usually it was transferring the difficulties from one station to another. Another reason for not transferring Chaplain Baz was if he was to be assigned to Beckley, West Virginia, he would be the only full-time chaplain on that station. One of the things we felt the chaplains needed in their probationary year is the guidance of an older, more experienced, not necessarily older, but more experienced chaplain.

Cherry also mentions in another part of his deposition that in order to transfer Mr. Baz to Beckley, the central office would have had to shuffle a number of other chaplains to make room for the transfer.

B. The court is required to make judgments about credibility. I found the plaintiff's answers on cross-examination to be evasive and disingenuous. His responses in court and to the defendant Neely at the time of certain occurrences that were described, specifically about the dying patient's family, and the borrowing money from a patient, and entering Mr. Neely's desk to look at papers that were there were dissembling. On the other hand, I found the testimony of the defendants Neely and Birdzell to be forthright and credible.

C. Turning finally to the First Amendment claim, another aspect of the case, aside from the claims of intentional discrimination, deserves discussion. Is the prohibition against the plaintiff proselytizing and evangelizing the patients at the government hospital a policy in contravention of the establishment clause or of the free exercise clause of the First Amendment? Put another way, the question presented is whether the plaintiff should have been able to preach the Gospel of Jesus Christ according to the spiritual dictates of the plaintiff's conscience without regard to the policy considerations of the medical and psychiatric program of the lay staff at the hospital.

■ Regulation as to the time, place, and manner of the exercise of freedom of religion is proper when that regulation is reasonably related to a valid public interest. *Bridges v. Davis*, 443 F.2d 970, 973 (9th Cir.1971). In addition, "First Amendment rights must be applied in light of the special characteristics of the environment in a particular place." *Smith v. United States*, 502 F.2d 512, 517 (5th Cir.1974), *quoting Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972), *cert. denied* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695. And often activities and practices of individuals, though religiously motivated, are subject to state regulation under the State's power to promote health, safety, and public welfare. *Windsor Park Baptist Church v. Arkansas Activities Association*, 658 F.2d 618, 621 (8th Cir.1981). Public employment, however, may not be conditioned upon the denial of constitutional rights. *Keyishian v. Board of Regents*, 385 U.S. 589, 605–606, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967); *Donahue v. Staunton*, 471 F.2d 475, 480 (7th Cir.1972). The government may, therefore, not prohibit or control the conduct of a person in its employ for reasons that infringe upon constitutionally guaranteed freedoms. It is permissible, nevertheless, for the government to regulate activities of its employees which "di-

rectly interfere" with the proper performance of its employee's duties. *See Smith v. United States*, 502 F.2d at 516. As it is certain that the plaintiff has no First Amendment right in and of itself to conduct religious services and offer religious counsel in a government institution, *see O'Malley v. Brierly*, 477 F.2d 785 (3rd Cir.1973), the issue becomes whether plaintiff's religious practices directly interfered with the proper performance of his duties at the medical facility and whether the facility's policies as they affect the plaintiff's religious activities were "reasonably related" to a valid public interest.

A case, while it is not directly parallel, but is analogous to this, is *Smith v. United States*, 502 F.2d 512 (5th Cir.1974). There, in a federal employee discharge case, the Court of Appeals for the Fifth Circuit held that wearing a peace pin while on duty at a VA hospital was a material and substantial interference with the performance of the plaintiff's duties as a staff psychologist charged with the task of administering psychotherapeutic treatment to emotionally disturbed veteran patients. The Veterans Administration was justified, therefore, in discharging the plaintiff from employment when he refused to conform to hospital policy, notwithstanding his claim that wearing the pin constituted symbolic speech protected by the First Amendment. Certainly if wearing a pin under the circumstances described in the *Smith* case was a definite interference with the policies and functions of the Veterans Administration Hospital as it related to psychiatric patients, the evangelizing and proselytizing and other conduct of the plaintiff described in this case would also be an unwarranted interference with those public policies and functions.

IT IS THEREFORE ORDERED by the court that the Clerk enter judgment in behalf of the defendants and against the plaintiff and for costs; the plaintiff to take nothing and the defendants to go hence without day.