Franklin BAZ, Plaintiff-Appellant,

v.

Harry N. WALTERS, Administrator of Veterans Affairs, S.H. Birdzell and Taylor D. Neely, Defendants-Appellees.

No. 85–1110.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1985.

Decided Jan. 28, 1986.

---

Michael D. Clary, Law Office of Richard J. Doyle, Danville, Ill., for plaintiff-appellant.

Charlene A. Quigley, U.S. Atty., Danville, Ill., for defendants-appellees.

Before CUDAHY, ESCHBACH, and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

Franklin Baz, formerly a chaplain of the United States Veterans Administration (V.A.), brought suit against two of his superiors at the V.A. Medical Center in Danville, Illinois and the V.A. administrator, alleging disparate treatment in employment on the basis of religion. He sought reinstatement and backpay under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., damages under 42 U.S.C. § 1981 and damages under the First Amendment to the United States Constitution. The district court found that Reverend Baz had not carried his ultimate burden of persuasion on the Title VII claim [1] and that the limitations put on his religious practice while working as a government chaplain contravened neither the free exercise nor establishment clauses of the First Amendment. Reverend Baz appeals several of the trial court's findings with respect to his Title VII claim and the trial court's conclusion that the First Amendment was not violated. We affirm.

## I. FACTS

Franklin Baz received a Bachelor's degree in Bible and Theology from Southeast-

---

1. The district court expressed doubt as to whether § 1981 extends to discrimination on the basis of religion but did not decide the issue, noting that the elements of a § 1981 claim are identical to those of a Title VII disparate treatment claim. *Baz v. Walters,* 599 F.Supp. 614, 619 n. 3 (C.D.Ill. 1984).

ern Bible College of Lakeland, Florida in 1967. He was ordained a minister of the Assemblies of God Church in 1970. For the next six years, he held part-time positions as associate pastor and hospital chaplain while continuing his schooling; in 1976, he was graduated from the Lutheran Theological Seminary in Columbia, South Carolina with a Master's degree in Divinity.

In 1977 Reverend Baz applied to the V.A. for a full-time chaplain position. Although he lacked the required three-year postgraduate parish ministry experience, he was appointed a chaplain on September 6, 1977. He was assigned on a probationary basis to the V.A. Medical Center in Danville, Illinois, a full-service medical facility with between 1000 and 1200 patients, including approximately 800 psychiatric patients. During Reverend Baz's tenure at Danville, there were four other chaplains on the staff: Chief of Chaplains John W. Devine, a Protestant, who left Danville in December 1977; Reverend John H. Peninski, a Roman Catholic; Reverend Gary H. Johnson, a Protestant; and Reverend Taylor D. Neely, a Protestant, who arrived in February 1978 and succeeded Reverend Devine as Chief of Chaplains.

The district court noted that Reverend Baz "from the beginning ... had difficulty in the discharge of his duties," recounting incidents in which Reverend Baz accepted honoraria for conducting funerals and borrowed money from a patient to purchase gasoline, both violations of V.A. regulations; failed to follow regulations in requisitioning a film, "The Cross and the Switchblade," to show to patients; was not punctual in his duties at the hospital; and failed to maintain adequate records of patient contact. *Baz v. Walters*, 599 F.Supp. 614, 617 (C.D.Ill.1984). The district court concluded, however, that

> [these] matters ... while they appeared to have entered into the plaintiff's termination, are not the primary or even the significant reason he was discharged. The crux of the plaintiff's problems lay in his relationship with the patients and with the medical staff and in plaintiff's

view of his ministry and his calling to preach the Gospel.

*Id.*

Most of Reverend Baz's clashes with the hospital administration occurred after Reverend Neely had arrived at Danville.

The plaintiff had been placed in charge of the Sunday evening "sung service." It was intended, Reverend Neely says, as a recreational period for the patients with music as a main attraction. The plaintiff had changed the format of the event to a Christian evangelical service. He preached and encouraged musical participation in a manner that Reverend Neely interpreted as proselytizing. On one occasion, Reverend Neely recalled, a sermon the plaintiff gave containing [sic] an illustration of threatening harm to a child's eye with a pair of scissors. The Reverend Neely found this totally inappropriate for a patient group which was largely psychiatric in nature and tended to concretize illustrations. Reverend Neely also found the methods employed by the plaintiff to be contrary to the Veterans Administration regulations against proselytizing. Consequently, the Sunday evening services were transferred to the recreational department and the plaintiff was excluded from them.

Reverend Neely recounted other problems the plaintiff had in dealing with patients at the Medical Center. There were incidents in which the plaintiff interfered with the decisions of the medical staff. An example was given of a patient of advanced age who was dying and the plaintiff decided that the physicians were not caring properly for the patient. So the plaintiff telephoned the patient's daughter and asked her to intervene and have her father's course of treatment changed. On other occasions the plaintiff entered the operating amphitheater to pray while the physicians were engaged in surgical procedures. That occurred on four occasions, according to the plaintiff's statement, and as near as I am able to tell from the testimony, he did not have the approval of the physicians

to enter the operating room on three of these occasions. Another incident was recounted by Reverend Neely involving a patient who had received the sacrament of communion and was experiencing feelings of guilt because he had done so. The plaintiff, Reverend Neely says, contradicted the assurances of forgiveness and comfort which Neely was emphasizing to the patient and instead reinforced the plaintiff's feelings of guilt and dependency.

In short, the plaintiff's view of his function as a Veterans Administration chaplain in a Veterans Administration hospital with psychiatric patients was decidedly different from the demands of his superiors. The plaintiff saw himself as an active, evangelistic, charismatic preacher while the chaplain service and the medical staff saw his purpose as a quiescent, passive listener and cautious counselor. This divergence in approach is illustrated by the plaintiff's listing "twenty-nine decisions for Christ" in his quarterly report of activities of the Veterans Administration. It was one of the matters pointed out to the plaintiff by Reverend Neely as unacceptable conduct on the part of the Veterans Administration chaplain.

*Id.* at 617–18.

Reverend Neely testified that he attempted to "counsel" with Reverend Baz about his difficulties and that Reverend Baz took this as a series of reprimands. Reverend Baz contacted Reverend James Rogers, the national Director of Chaplain Services, and Reverend Theodore Gannon, the leader of the Assemblies of God Church, to enlist their aid. Both men visited Danville; after his visit, Reverend Rogers suggested that Reverend Baz be transferred to a general medical facility (one without a large psychiatric population like Danville). Reverend Neely tried to do this, but before the transfer came through, Reverend Rogers retired as Director of Chaplain Services and was succeeded by Reverend Corbin Cherry. Reverend Cherry decided that Reverend Baz should be discharged. He testified as to his reasons: (1) Reverend Baz should never have been appointed to the chaplaincy because he lacked the requisite post-graduate pastoral experience; (2) the planned transfer was to a facility in which Reverend Baz would be the only full-time chaplain, which Reverend Cherry thought unwise; and (3) chaplains would have to be shuffled between six or seven hospitals to effect this transfer.

Reverend Baz's employment was terminated on September 1, 1978. His written notification listed five reasons for the action: (1) failure to demonstrate appropriate professional skills for a psychiatric facility; (2) difficulties in assuming responsibilities for punctuality in meeting appointments and completing assignments; (3) failure to demonstrate ability to understand a multidisciplinary approach to patient health care; (4) failure to understand the need to work within established procedures to accomplish objectives; and (5) difficulty in relating to other chaplains, which complicated the effective coordination of their spiritual ministry.

Reverend Baz filed a formal charge with the Equal Employment Opportunity Commission (EEOC) in December 1978. The EEOC investigated the charge and in February 1980 issued a finding of no discrimination, expressly adopting the reasons for termination set forth by the V.A. On September 4, 1980 Reverend Baz filed this suit in the United States District Court for the Central District of Illinois. After a bench trial, judgment was entered on behalf of the defendants on November 19, 1984 and this appeal ensued.

## II. TITLE VII

Reverend Baz contends on appeal that the trial judge should not have ruled for the defendants on the Title VII claim because it erred in finding that the V.A. could not reasonably "accommodate" his religious ministry. He argues more generally

that the district court failed to base its decision on the record as a whole.[2]

We note at the outset that this case differs from the typical Title VII action involving disparate treatment on the basis of religion. In the usual case, an employee, hired to perform secular duties by a secular employer, alleges that he was fired because his religious practices made it difficult or impossible for him to perform the secular duties. *See, e.g., Redmond v. GAF Corp.*, 574 F.2d 897 (7th Cir.1978) (Sabbatarian plaintiff alleged he was fired for refusing to work Saturday overtime). In this case, however, the plaintiff alleges that he was hired so that he might practice his religion in the service of a secular employer[3]—and was fired when his employer did not approve of his doing exactly that. *See* Appellant's Brief at 21 ("His employment required him to minister directly with pa-

tients and his religious affiliation, the Assemblies of God, required him to fulfill certain theological tenets and practices."). Yet this characterization of the facts, while poignant, is not wholly accurate. A V.A. chaplain is hired to conduct a ministry in a V.A. facility and is provided with detailed instructions as to his duties and as to the prohibitions that apply to his actions. He is not simply a preacher but a secular employee hired to perform duties for which he has, by dint of his religious calling and pastoral experience, a special aptitude.[4] Thus, there is no reason to analyze this case differently from the typical Title VII case.

## A. Accommodation of Religious Practice

Title VII forbids an employer from firing an employee solely on the basis of his reli-

---

**2.** Reverend Baz raised two additional trial court errors, which can be disposed of more quickly.

First, Reverend Baz argues that the trial court relied on hearsay testimony in reaching its decision. He refers specifically to two pieces of testimony: (1) Mr. S.H. Birdzell, chief of Danville's medical staff, testified that he had received reports that Reverend Baz had been entering operating amphitheaters to pray for patients during surgery without the permission of the families involved or the doctors, Trial Transcript at 80; (2) Reverend Neely testified that Mr. Birdzell had told him that one of the staff physicians was very upset because Reverend Baz had interfered with the treatment of a dying patient by calling the patient's daughter and urging her to object to the treatment, Tr. at 220–22. Mr. Baz's contentions about the first testimony is without merit for two reasons: (1) no objection was made at the time the testimony was elicited (despite the fact that Mr. Birdzell prefaced his testimony with the remark, "This is only hearsay ..."), Tr. at 80; and (2) Mr. Baz himself testified as to the same occurrence, stating that he had entered the operating amphitheater *four* times, Tr. at 184–85. As to the second, the hearsay objection was overruled because the testimony was relevant to defendant Neely's state of mind, a material factor in a disparate treatment claim. We need not examine too closely, however, the uses to which the trial court put the evidence because, once again, Reverend Baz testified to the same facts, admitting in addition, "I think I made a mistake on [sic] what I did." Tr. at 198.

Reverend Baz's second claim of error is that the trial court admitted the findings of the EEOC investigation as a defense exhibit. The EEOC's report is admissible unless it can be shown in some way not trustworthy. Fed.R.

Evid. 803(8)(c); *see Chandler v. Roudebush*, 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1961 n. 39, 48 L.Ed.2d 416 (1976); *Tulloss v. Near North Montessori School, Inc.*, 776 F.2d 150, 153 (7th Cir. 1985). The trial court heard the appellant's objections to the EEOC report, held that they went to weight rather than admissibility and received the report into evidence. Tr. 270–72. Appellant has made no arguments that suggest that the trial court abused its discretion in doing this. *Cf. Tulloss, supra*, at 154 (reviewing cases and concluding that "in all circuits, the trial judge has ... great discretion" in admitting EEOC reasonable cause determinations).

**3.** Also distinguishable are those cases in which the employer has a sufficiently strong religious affiliation so that an employee's religious observation may be a bona fide occupational qualification. *See, e.g., Pime v. Loyola University of Chicago*, 585 F.Supp. 435 (N.D.Ill.1984).

**4.** Reverend Baz places great weight on a section of the V.A. Chaplain's manual regarding "special privileges of chaplains." Here it reads, "The chaplain continues to be a clergyman of his church and will not be required to perform any act or function contrary to the doctrine or practice of his church." Plaintiff's Exhibit #1, at 2–1. He ignores, however, the many qualifiers placed throughout the manual. For example, "[i]t is particularly important that the chaplain recognize the necessity to coordinate his program with the overall program of the hospital ...", *id.* at 3–1, and "[w]hile the chaplain will try to serve all those who can profit by his services, he will not proselytize.... The chaplain will not impose his ministry on those who do not desire it ...", *id.* at 3–5.

gion, 42 U.S.C. § 2000e–2(a)(1), unless the employer can demonstrate that "he is unable to reasonably accommodate to an employee's ... religious observation or practice without undue hardship on the conduct of the employer's business," 42 U.S.C. § 2000e(j). We have described a plaintiff's prima facie case in a Title VII action alleging religious discrimination as a showing that his practices are "religious" and that these practices were the basis for his discharge.[5] If the plaintiff makes this showing, the burden shifts to the employer to demonstrate that he cannot accommodate the plaintiff's religious practice without undue hardship to his business. If the defendant successfully rebuts the prima facie case, the plaintiff, who has the ultimate burden of persuasion, must show that the employer's proffered reasons for failure to accommodate are a pretext for discrimination. *Redmond v. GAF Corp.*, 574 F.2d at 901.

The district court was correct in finding that the plaintiff had made out a prima facie case of religious discrimination. We do not doubt that Reverend Baz's actions were "religious" within the meaning of the statute. Further, the district court found that the primary reason for Reverend Baz's discharge lay in his "view of his ministry and his call to preach the Gospel." *Baz v. Walters*, 599 F.Supp. at 617. The burden thus shifted to the defendants to produce evidence tending to rebut the inference of discrimination raised by the plaintiff's prima facie case. The defendants produced evidence showing (1) that their primary motivation in terminating Reverend Baz was to further the primary purpose of the hospital, which is the overall well-being of the patients; (2) that Reverend Baz was unable to conform to the "multi-disciplinary" approach to patient care taken by the V.A. in a medical facility specializing in the care of psychiatric patients; (3) that they had attempted to offer Reverend Baz guidance in how to so conform; and (4) that accommodation in the form of a transfer of Reverend Baz to a non-psychiatric facility had been considered but rejected as an undue burden on the Chaplain Service and the V.A. The district court found that the defendants had met their burden of producing rebuttal evidence and that Reverend Baz had failed to carry his ultimate burden of persuasion with a showing that the proffered rebuttal was pretext.

Reverend Baz contends on appeal that the defendants did not meet their rebuttal burden because they did not show by "objective, expert testimony" that the "health and welfare" of the Danville patients was harmed by his evangelism at the hospital. But when Reverend Baz makes this objection, he is confusing the business necessity defense to a disparate impact cause of action with the "undue hardship" standard used to measure an employer's duty to accommodate to an employee's religious observances in a disparate treatment claim of religious discrimination.[6] In suits such as Reverend Baz's, the defendant need only introduce evidence to show that accommodation would create a hardship on his business. This hardship has been construed as anything more than a *de minimis* cost to the employer. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 2276, 53 L.Ed.2d 113 (1977). The defendants are not required to show that their philosophy of total patient care is objectively better than that espoused by Reverend Baz; they need only show that it would be a hardship to accommodate his theology in view of their established theory and practice.

■ The defendants here have met this burden. They have produced evidence

---

**5.** We have also required a religious-discrimination plaintiff to show that he called his religious practices to his employer's attention. *See Redmond v. GAF Corp.*, 574 F.2d at 901–02. It is not clear that Reverend Baz made this showing but we have waived that showing where the record shows that the employer did have notice of the conflict. *Id.*

**6.** Thus, his heavy reliance on *Wright v. Olin Corp.*, 697 F.2d 1172 (4th Cir.1982) (requiring expert testimony of medical consequences of toxic materials in a case involving the disparate impact of a chemical manufacturer's "fetal vulnerability" policy), is misplaced.

tending to show that Reverend Baz's philosophy of the care of psychiatric patients is antithetical to that of the V.A. To accommodate Reverend Baz's religious practices, they would have to either adopt his philosophy of patient care, expend resources on continually checking up on what Reverend Baz was doing or stand by while he practices his (in their view, damaging) ministry in their facility. None of these is an accommodation required by Title VII.

Reverend Baz also asserts on appeal that defendants did not show that they could not have accommodated him through a transfer to a non-psychiatric facility. Just one of the several reasons that the defendants offered for not transferring Reverend Baz would have been sufficient. Reverend Neely testified that to transfer Reverend Baz would require a shuffling process involving as many as seven hospitals to create a space at the West Virginia hospital that had been suggested. An employer need not disturb the job preferences of other employees to accommodate an employee's religious observance. *Hardison*, 432 U.S. at 81, 97 S.Ct. at 2275. The shuffling would also create a more than *de minimis* administrative cost, not least because such a move would require contravening the V.A. policy of not transferring probationary chaplains or chaplains experiencing difficulties of adjustment. *See* Waterman deposition at 24–26. In addition, Reverend Cherry saw a risk in assigning Reverend Baz to a hospital at which he would be the only full-time chaplain, without a superior.

### B. Sufficiency of the Evidence

Reverend Baz also asserts that the entire trial record supports his case and that the trier ignored key evidence in reaching his result. The three pieces of evidence on which Reverend Baz focuses in his brief are (1) his own testimony; (2) a report written by Reverend Rogers, the Director of Chaplain Services, after his trip to Danville; (3) certain portions of the V.A. Manual, which set forth rules and regulations for the V.A. chaplaincy.

As for the plaintiff's own testimony, we note first that he himself testified to a number of the damaging incidents upon which he feels the trier laid too great a stress. At times, his testimony was substantially similar to that of Reverend Neely and Mr. Birdzell and served to call into question his professional judgment. *See supra* note 2. Other times, the plaintiff and the defendants, not surprisingly, put different interpretations on the facts (for instance, Reverend Neely refers to "counseling" sessions with Baz, Tr. at 13, who calls these conferences "reprimands," Tr. at 201). But assessments of credibility are left to the trier and here the district court specifically found that "the plaintiff's answers on cross-examination [were] evasive and disingenuous. His responses in court and to the defendant Neely at the time of certain occurrences ... were dissembling. On the other hand, I found the testimony of the defendants Neely and Birdzell to be forthright and credible." *Baz v. Walters*, 599 F.Supp. at 620. We cannot say that the district court gave insufficient weight to Reverend Baz's testimony.

Appellant also argues that the district court "ignored" a report submitted by Reverend Rogers and Reverend Rogers' deposition testimony. Actually, the district court did take note of these in its opinion:

> Both the Reverend Rogers and the Reverend Gannon visited Danville in an attempt to assist the plaintiff in adjusting to his position as chaplain. It is evident from the testimony of Reverend Rogers that he viewed the placement of the plaintiff at a hospital with a heavy psychiatric caseload as a mistake. It is also obvious from the testimony that Reverend Rogers wanted to salvage the plaintiff's career and thought that transfer to a general medical and surgical facility might accomplish that.

*Id.* at 618. The trial court also found that Reverend Cherry, who succeeded Reverend Rogers as director of the V.A. chaplaincy and decided to terminate Reverend Baz, gave reasons for his decision sufficient to rebut any inference of discrimination.

There is no inconsistency here. Just because an employer keeps on an employee who might legally be discharged does not mean that the termination is unlawful when it occurs. Further Reverend Rogers' report, which stated that "there was some evidence of religious discrimination," was significantly undercut by his subsequent deposition testimony. Reverend Rogers stated that he did not remember why he wrote the report or that he had written it at all. Rogers deposition at 60–61. He also testified as to what he had meant by "discrimination":

> No, he was not persecuted. I think he was discriminated against because there is a difference between being persecuted against and being discriminated.... I think discrimination also means differences. And I think this is two people that were brought up with two separate backgrounds, and they're two good people, too.... But I think there was discrimination as far as I'm concerned as far as understanding each other or helping each other, and there was no help there.

*Id.* at 113.

The last piece of evidence that Reverend Baz contends was ignored is the V.A. chaplain's manual. As we have already noted, *see supra* note 4, Reverend Baz himself cites the manual too selectively. The district court placed sufficient weight on the entire manual in making its findings.

### III. FIRST AMENDMENT

Reverend Baz contends that the trial court erred in concluding that the V.A.'s prohibition against a chaplain preaching or proselytizing in a government hospital violated neither the free exercise nor establishment clauses of the First Amendment. We agree with the district court that the First Amendment has not been violated here.

#### A. Free Exercise

Appellant is correct that public employment may not be conditioned upon the denial of constitutional rights, *see Keyishian v.*
*Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967); yet it is also true that the appellant has no absolute constitutional right to conduct religious services and offer religious counsel in a government institution, *see O'Malley v. Brierly,* 477 F.2d 785, 793 (3d Cir.1973). Time, place and manner restrictions apply here as anywhere and involve balancing the right asserted against a valid public interest. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court held that when a government employee asserts that his constitutional rights have been infringed, the court must strike a balance between the employee's interests as a citizen and "the interest of the [government] as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1735. *See also Donohue v. Staunton,* 471 F.2d 475 (7th Cir.1972). As the discussion *supra* Part II indicates, the hospital administration thought, and the district court agreed, that Reverend Baz's religious activities at Danville, were detrimental to the best interests of the patients and to the general maintenance of order at the hospital.

"First Amendment rights must be applied in light of the special characteristics of the environment in a particular case." *Clark v. Holmes,* 474 F.2d 928, 931 (7th Cir.1972), *cert. denied,* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). Here, the specific environment was a medical facility specializing in the care of psychiatric patients. Support for the conclusion that the V.A. was justified in limiting Reverend Baz's religious expression in this environment can be found in an analogous case involving the First Amendment right to free speech. In *Smith v. United States,* 502 F.2d 512 (5th Cir.1974), a staff psychologist was discharged because he insisted upon wearing a peace pin, in violation of V.A. regulations, while treating emotionally disturbed veterans at a V.A. hospital. The Fifth Circuit ruled that, even though the wearing of the pin constituted symbolic speech, the psychologist's actions resulted

in a material and substantial interference with his therapeutic duties. Such a finding has been made in Reverend Baz's case as well, and it is enough to justify limiting his First Amendment right to religious expression in this context.

## B. Establishment of Religion

Reverend Baz also contends that the V.A. through its rules and regulations governing the conduct of V.A. chaplains has impermissibly established an "institutional theology" at V.A. facilities. He does not assert that the V.A. chaplaincy itself violates the establishment clause (indeed, in his Title VII claim he seeks reinstatement as a V.A. chaplain) but rather that the V.A. violated the establishment clause of the First Amendment when it took steps to "limit and restrict the manner in which the Plaintiff could pray with patients, preach, and also limited the content of his sermons." Appellant's Brief at 31. He asserts that he was discharged because he would not conform his ministry to the dictates of the V.A.-sanctioned "institutional theology."

It is true that the medical staff at Danville views the role of a chaplain as that of a "quiescent, passive listener and cautious counselor" while Reverend Baz saw himself in the role as an "active, evangelistic, charismatic preacher." *Baz v. Walters*, 599 F.Supp. at 617. But there is no evidence that the V.A. has "institutionalized" a theology at Danville or any other facility. What the V.A. has instituted is an ecumenical approach to its chaplaincy with special attention to the sensitive needs of its patient population.[7]

The V.A. provides a chaplain service so that veterans confined to its medical facilities might have the opportunity to participate in worship services, obtain pastoral counselling and engage in other religious activities if they so desire. If there were not a chaplaincy program, veterans might have to choose between accepting the medical treatment to which their military service has entitled them and going elsewhere in order to freely exercise their chosen religion. This itself might create a free exercise problem. *Cf. Katcoff v. Marsh*, 755 F.2d 223 (2d Cir.1985) (the First Amendment "obligates Congress, upon creating an Army to make religion available to soldiers who have been moved by the Army to areas of the world where religion of their own denominations is not available to them"). But, at the same time, the V.A. must ensure that the existence of the chaplaincy does not create establishment clause problems. Unleashing a government-paid chaplain who sees his primary role as proselytizing upon a captive audience of patients could do exactly that. The V.A. has established rules and regulations to ensure that those patients who do not wish to entertain a chaplain's ministry need not be exposed to it. Far from defining its own institutional theology, the medical and religious staffs at Danville are merely attempting to walk a fine constitutional line while safeguarding the health and well-being of the patients.

Since we agree with the district court that Reverend Baz has shown neither that he was the victim of religious discrimination nor that his rights under the First Amendment were violated, the judgment of the district is affirmed.

---

7. Reverend Neely testified at trial as to his philosophy of an ecumenical institutional chaplaincy. He stated his belief that in a hospital setting there are parameters within which a chaplain of any denomination should conduct his ministry:

> [Y]ou obey the rules of the institution and they relate to time, tours of duty, you do not part the patients, you do not take advantage of the patients, you recognize the dignity of the patient and his ability to draw upon his own human resources, and you do not try to impose your particular beliefs or religion and feel as much responsibility for the privacy of the patient and his capacity or ability to say no to you....
> You have to work with other disciplines. The primary purpose of any hospital [is] to bring healing to the patient, to get him back out into the community.

Tr. at 283–84.