Glenda BEASLEY, Plaintiff–Appellant,

v.

HEALTH CARE SERVICE CORP.,
d/b/a Blue Cross/Blue Shield of
Marion, Illinois, Defendant–Appellee.

No. 90–2699.

United States Court of Appeals,
Seventh Circuit.

Argued July 10, 1991.

Decided Aug. 20, 1991.

Darrell Dunham (argued), Ronald L. Isaacs, Norma J. Beedle, Carbondale, Ill., for plaintiff-appellant.

Richard Shaikewitz, Samuel A. Mormino, Jr. (argued), Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, Alton, Ill., for defendant-appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and PELL, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Glenda Beasley is a Christian fundamentalist who strongly believes that God is the most important thing in her life. She sued her employer, Blue Cross/Blue Shield of Marion, under Title VII for religious discrimination, claiming that Blue Cross told her to make her job the number one priority in her life and allowed fellow employees to harass her for her religious beliefs. After a bench trial, the district court entered judgment for Blue Cross, and Beasley now appeals. We affirm.

I

Blue Cross processes Medicare claims under a contract with the federal government. It hired Beasley on May 23, 1984 as a Reasonable Charge Specialist and promoted her to supervisor fourteen months later. In January 1986, Beasley attended a company-sponsored weekend training session for supervisors. The training session was designed to improve the supervisors' communication and management skills. One part of the training involved teaching supervisors how to analyze and classify their subordinates [1] and handle them in various situations. During another part of the training, the supervisors were told that they had to make Blue Cross their number one priority. Although Beasley did not object immediately to any aspects of the weekend training, she claimed that the classification training and the requirement to make Blue Cross number one put her under "extreme tension and ... caused her to alter her behavior in the workplace."

Beasley's work performance—as reflected in her employment file—began to deteriorate a month after the seminar. Beasley's supervisor, Barbara Harrigan, "counseled" Beasley on February 3, 1986 about visiting with friends during hours. On February 4, Harrigan wrote a memo claiming that Beasley improperly delegated a job responsibility to a subordinate. Alleged proof of Beasley's misconduct, however, was a memo dated February 6—two days after Beasley was reprimanded. This and similar inconsistencies supported Beasley's argument at trial that Blue Cross padded her personnel file with negative and subjective work evaluations in order to justify her later discharge. Harrigan explained that the inconsistencies were innocent errors that were caused by her inability to write some memos, because of a paperwork backlog, until a week or two after incidents occurred.

In late February 1986, Blue Cross received an anonymous letter which complained that Beasley was "a religious nut" who was "harassing her unit in a religious manner." The personnel manager at Blue Cross, Dave Hoover, conducted an investigation and concluded that the complaint was invalid because no one came forward to substantiate the allegations in the letter.[2] Later, an employee named Pine Price was involved in a dispute with Beasley involving the use of a personal computer and called Beasley "a religious hypocrite." In another incident, Beasley was accused of leaving religious pamphlets in the restroom. In the weeks that followed the anonymous letter incident, Beasley repeatedly requested to see the letter and to be told details of the investigation. A

1. As the district court noted, "the supervisors identified their subordinates as 'jerks' (troublesome employees), 'snakes' (union agitators), or 'dreams' (outstanding employees)."

2. Hoover initially interviewed a number of Beasley's subordinates individually, and he then held a meeting of the full unit. At the meeting, attended by both Beasley and Harrigan, no one stepped forward to claim responsibility for the letter or the complaints contained in it. The investigation was therefore terminated and Beasley was not disciplined.

meeting was held between Beasley, Hoover and the company's attorney, Ken Richmond, to discuss the incident. During the conversation Beasley agreed that her priorities were "God first, family second, and job third."

In May 1986, Harrigan reprimanded Beasley because her unit incorrectly processed a large number of claims. Beasley was transferred to a less prestigious job that did not provide an administrative assistant. The lack of an assistant, coupled with an arthritic knee condition, allegedly caused Beasley to take a disability leave in June 1986. During the three-month leave, however, Beasley went on a three-week missionary trip to China.[3] Many of Beasley's fellow supervisors were angered upon learning of the trip because they had to cover Beasley's work while she was gone. One of these supervisors, Jacque McCarty, was particularly incensed. McCarty seems to have disliked Beasley from the start, opposing the decision to make her a supervisor and nicknaming her "Bible Bertha." When Beasley returned from her disability leave, she and McCarty had a number of clashes. As a result, Blue Cross transferred McCarty to the mail room to keep her and Beasley separated.[4]

Conflicts between Beasley and Harrigan also continued after Beasley's return. Harrigan gave Beasley an unfavorable evaluation, and Beasley in turn wrote a letter to the company president charging Harrigan with religious discrimination and requesting an independent evaluation. A meeting between Beasley, Harrigan and several Blue Cross executives on October 13, 1986, failed to resolve the dispute. On November 18, 1986, Beasley filed a complaint with the Illinois Department of Human Rights and the EEOC, alleging that she was being discriminated against on the basis of her religion.

In December 1986, Beasley was assigned to supervise a new unit. The unit was created to update the payment levels that Blue Cross would honor under its contract with the government. The unit recalculated these cost figures and entered the new data into a computer. Beasley's new supervisor, Tom Bartels, approached her on the first day in the department and told her not to harass the other employees in the unit on religious subjects. Bartels had no concrete evidence that Beasley had ever harassed employees in this way, he had just heard a rumor and wanted to warn Beasley that proselytizing on company time was not permitted. Beasley worked in the new position until January 1987 and then started a second period of disability.

Beasley returned to her old position under Harrigan in April 1987 after having surgery on her knee. Conflicts soon arose. Beasley claimed that she could not perform her old job the way that Harrigan wanted it performed. As a supervisor, Beasley was supposed to pass out assignments and monitor the performance of her subordinates. Because of her knee problems, however, she put the assignments in a box on her desk and had the employees come to her for work. Harrigan thought that this was inefficient and that Beasley should use a wheelchair to perform the work the way Harrigan wanted it done. Beasley countered that the aisles were too narrow for a wheelchair. About a week after starting back to work, Beasley put in a request for vacation time to be taken in mid-June. Sometime in the fall of 1986, Beasley began a religious toy business in her free time, and she sought the vacation time in order to go to a religious toy convention. Harrigan rejected the request, citing the fact that Beasley had been gone for six of the last nine months on leave and needed more time in her new unit to establish her

---

3. Beasley had previously asked for three weeks of vacation in order to take this trip, but Blue Cross denied the request.

4. Beasley was also told to take more initiative in resolving her disputes with McCarty, suggesting that it was not always necessary to involve management in what seemed to be a personality clash. Someone apparently joked with Beasley

that she should take McCarty "out to the parking lot." Beasley claimed at trial that the comment was not offered in jest, but the district court rejected the notion that the company would tell its supervisors to resolve their problems by "duking it out in broad daylight" in the company parking lot.

supervisory role. Harrigan told Beasley that she would consider giving Beasley vacation time after July 1, 1987.

In May 1987, an employee named Mary Ann Caldwell reviewed the data that Beasley's unit had entered into the computer in December 1986 and found serious errors in the calculations.[5] On May 13, 1987, Caldwell wrote a memo to Bartels to inform him of the errors. The payment levels had to be recalculated at substantial cost to Blue Cross. It was this error that allegedly led to Beasley's termination on May 13. Beasley claimed at trial that the errors were not discovered until May 19 or 20. The court, however, found that these latter dates represented the dates when corrected data was furnished as input, rather than the date when the errors were discovered.

In her suit, Beasley alleged that Blue Cross had violated Title VII (1) by firing her on account of her religion; (2) by tolerating a religiously hostile work environment; and (3) by failing to accommodate her religious beliefs. After a bench trial, the district court entered judgment for Blue Cross, holding that Beasley had failed to demonstrate that Blue Cross fired her because of her religion. Instead, the court concluded, Blue Cross fired Beasley because of her poor work performance. In addition, the judge concluded that Beasley's harassment claims were unfounded either because the alleged conduct did not constitute harassment, or because (even if it could be so characterized) the conduct did not rise to the level of a Title VII violation. Finally, the judge rejected Beasley's arguments that Blue Cross failed to accommodate her religious beliefs by refusing her request for vacation time or by subjecting her to the supervisor training seminar. The court concluded that Beasley's vacation request was motivated by her economic interest in the toy business rather than by her religion, and that Beasley's claim of being subjected to Blue Cross' "New Age" religion at the seminar was unfounded.

## II

On appeal, Beasley attacks the district court's factual findings. She claims both that the court erred in holding that she was fired for poor performance and that she was not subjected to a hostile work environment. The trial court's factual determinations are reviewed under the deferential "clearly erroneous" standard of review. *Redmond v. GAF Corp.*, 574 F.2d 897, 903 (7th Cir.1978); *see also Nottelson v. Smith Steel Workers Union*, 643 F.2d 445, 452 (7th Cir.1981); Fed.R.Civ.P. 52(a). "[A]ssessments of credibility are left to the trier," *Baz v. Walters*, 782 F.2d 701, 707 (7th Cir.1986), and we will reverse it determination only " 'if after a careful review of the record [we] are left with the definite and firm conviction that the finding is clearly wrong and that a mistake has been made.' " *Redmond*, 574 F.2d at 903 (quoting *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1286 (8th Cir.1977)).

█ The district court determined that Beasley failed to establish her prima facie case for discriminatory discharge. "Title VII forbids an employer from firing an employee solely on the basis of his religion ... unless the employer can demonstrate that 'he is unable to reasonably accommodate to an employee's ... religious observation or practice without undue hardship.' " *Baz*, 782 F.2d at 705–06 (quoting 42 U.S.C. § 2000e(j)). To establish a prima facie case, a plaintiff must show that (1) the practices are religious in nature; (2) the employee called the religious practices to the employer's attention, and (3) the religious practices were the basis of the discharge. *Id.; see also Redmond*, 574 F.2d at 901–02.

Beasley claims that the court erred in analyzing her discriminatory discharge claim because Blue Cross' evidence regarding the inaccurate computer data was not credible. Beasley focuses again on the inconsistencies between the date the memo reporting the errors was sent and the date the errors were discovered. But as the

---

**5.** Had the errors not been caught before the input data went "on-line," Blue Cross alleges that it would have lost six million dollars.

district court held, there was a plausible explanation for the inconsistencies and, in the court's opinion, Blue Cross' explanation was the more credible. Beasley has not demonstrated how this credibility determination was clearly in error.

Beasley's counsel claimed at oral argument that his client worked with another supervisor in Bartel's unit and that "there is no evidence in the record that Blue Cross fired the other supervisor" for the alleged errors in the data. If true, evidence along these lines would support Beasley's theory that Blue Cross fired her because of her religion; assuming the two supervisors were similarly situated, if one was fired while both were equally at fault, the inference arises that the firing was discriminatory. But Beasley did not offer any evidence on this point to the district court. Instead, Beasley suggests on appeal that it was Blue Cross' burden to come forward with evidence showing that it treated the two supervisors fairly. This argument misconstrues plaintiff's burden of proof. Blue Cross had no such burden; the *plaintiff* in a Title VII religious discrimination suit has the burden of showing that her religion was the basis of her discharge. *Baz,* 782 F.2d at 705–06; *Redmond,* 574 F.2d at 901–02. Beasley failed to introduce evidence to support the unequal treatment inference. A review of the record shows that Beasley offered no evidence at all that she and the other supervisor who was allegedly at fault were similarly situated. Beasley had accumulated in her file, by the time of her discharge, numerous negative performance reports, and she cannot say whether the other supervisor had any such reports, let alone as many as she had received. Thus, counsel's argument is without force.

Having determined that the district court did not err in finding that Beasley's discharge was for good cause, our analysis of the Title VII claim need go no farther. Beasley suggests that the court erred in its analysis of her workplace harassment claim, but Beasley's only remedy under Title VII is "reinstatement ... back pay ... or any other equitable relief." 42 U.S.C. § 2000e–5(g). "Since damages are not equitable relief, most courts have held that damages are not available to redress violations of Title VII that do not result in discharge." *Bohen v. City of East Chicago,* 799 F.2d 1180, 1184 (7th Cir.1986). In *Bohen,* we rejected the theory that damages are appropriate in harassment suits under Title VII. "If Congress wishes to amend the provisions of Title VII to provide a remedy of damages, it can do so. Until then, this court may only enforce the statute as written, and as currently written, Title VII does not contemplate damages." *Id.* Thus, Beasley's arguments that the court erred in analyzing her workplace harassment claim are unavailing since she was fired for cause.

Finally, Beasley frequently mentions Blue Cross' "requirement" that she put her job first and the conflict this requirement allegedly created between her religious beliefs and her employer's demands. She has failed to develop a coherent argument in her briefs or oral argument, however, to explain how these allegations add up to religious harassment. Beasley alleged that this requirement adversely affected her behavior at work, but is not specific about how or why her behavior was altered or how precisely the Blue Cross "requirement" violated her rights. She does not show how the Blue Cross priority for her job created an actual conflict with her religion. Beasley's attorney claimed at argument that employers must be precluded from attempting to motivate their employees by telling them to make their jobs number one since doing so creates a potential conflict with an employee's religious beliefs. There is, of course, no legal support for this argument. A company is simply not precluded from motivating its work force by asking its employees to make their jobs their top priority unless there is some actual conflict with religion. Although Beasley's attorney suggested at argument that Blue Cross ordered its employees to "place God third" (behind Blue Cross and family), this contention is quite illusory. The record citations Beasley's at-

torney gave us at oral argument on this point in no way support this claim.

### III

In sum, the issues in this case were tried to a judge who weighed the evidence carefully and determined that Beasley was not fired because of her religious beliefs but, instead, because of her inadequate performance. Beasley has been unable to demonstrate clear error in this determination, and we must therefore AFFIRM.